W.E. CALLAWAY, Jr., et al.,
Plaintiffs-Appellants,

v.

John R. BLOCK, et al.,
Defendants-Appellees.

No. 84–8433.

United States Court of Appeals,
Eleventh Circuit.

June 21, 1985.

Martha A. Miller, Atlanta, Ga., James B. Franklin, Statesboro, Ga., for plaintiffs-appellants.

Charles Rothfeld, U.S. Dept. of Justice, Solicitor General's Office, Washington, D.C., for defendants-appellees.

Before RONEY and HILL, Circuit Judges, and TUTTLE, Senior Circuit Judge.

JAMES C. HILL, Circuit Judge:

Appellants/plaintiffs, eight Georgia peanut farmers, appeal a district court order denying their request for a preliminary injunction barring implementation of the regulations currently promulgated as 7 C.F.R. Part 729 ("the 1984 regulations"). These regulations were adopted by the Secretary of Agriculture in 1984 to implement the provisions of the Agriculture and Food Act of 1981, Pub.L. 97–98, 95 Stat. 1213, ("the 1981 Act"), that authorize a reduction of the national peanut quota. We affirm the district court's order, and also reach the merits of some of appellants' claims, holding that the regulations are not inconsistent with the 1981 Act and that implementation of the regulations does not violate due process.[1]

---

1. It appears from appellants' complaint that they also claim that the regulations violate equal protection. This claim is not now before us, and we make no comments on it.

## I. BACKGROUND

### A. *The 1981 Act and Implementing Regulations*

For some time, the United States has had a national peanut quota. Peanut farmers throughout the country are given allotments of the quota, based primarily on the peanut production history of their land. The federal government provides guaranteed price supports for these quota peanuts, in an effort to provide peanut farmers with some income protection and consumers with consistent prices.

The 1981 Act amended prior acts governing peanut quotas by, among other provisions, reducing the national peanut quota in measured steps from 1982 through 1985. Specifically, the quota was to be reduced from 1,440,000 tons for 1981 to 1,200,000 tons for 1982, 1,167,300 tons for 1983, 1,134,700 tons for 1984, and 1,100,000 tons for 1985. 7 U.S.C. § 1358(k). In the Act, Congress directed the Secretary of Agriculture ("the Secretary") to accomplish these yearly reductions by "insofar as practicable and on such *fair and equitable* basis as the Secretary may by regulation prescribe" reducing the allotments made to the following peanut farms: (1) those that have not produced their allotted quota because of inadequate tillable land ("category I farms"); (2) those that, during two of the three previous years, did not produce their allotted quota for any reason other than natural disaster ("category II farms"); and (3) those where the quota was produced but by another operator on a farm to which the allotted quota was transferred by lease two of the previous three years ("category III farms").[2] *Id.* § 1358(*l*)(2)(A) (emphasis added). The Act also states that to achieve the reduction, "reductions ... shall be made first under clause (i) [which deals with category I farms] ... and, if necessary, under clause (ii) (I) [which deals with category II farms] and then clause (ii)(II)

[which deals with category III farms]...." *Id.* If these reductions are not sufficient to meet the mandatory quota reductions for any given year, the Act directs that the balance be made up "by such further reduction in ... quotas for farms ... as the Secretary determines to be fair and equitable." *Id.* § 1358(*l*)(2)(C). Those farms falling into this catch-all category, which covers potentially all peanut farms, are referred to herein as category IV farms.

In March 1982, the Secretary proposed regulations to implement that year's reduction. These regulations adopted what appellants call a "category-by-category" reduction plan. Under that plan, the quota allotments of category I farms were reduced first, then those of category II farms, then category III farms, and if further reduction were still required to meet that year's reduction goal, then category IV farms (*i.e.*, all other peanut farms). Pursuant to this plan, many category III farmers would have lost their quota allotments entirely.

Members of the congressional conference committee that had reviewed the 1981 Act objected to these proposed regulations. They maintained the regulations did not implement the reductions on a "fair and equitable basis," as required by the 1981 Act, since placement in category III would have to be based on the 1979–81 crop years. Because placement would thus be based on pre-Act crop activity, farmers who leased their quotas prior to passage of the Act had no opportunity to preserve their 1982 allotments by farming their quota allotments on their own land in two of the three years prior to 1982. For this reason, members of Congress urged that category III farmers be given some sort of special treatment, at least for 1982. The Secretary ultimately agreed that it would not be "fair and equitable" to implement

---

**2.** Ever since 1970, Congress has permitted peanut allotment holders to lease their quota peanut allotments to other farms. The main reason Congress permitted this was that increased mechanization of the peanut farming process had made it less economical to farm small tracts of land. Some farmers' allotments were as small as a fraction of an acre. Thus, leasing of allotments allowed farmers to pool their allotments and take advantage of economies of scale in peanut production. Record at 290.

the category-by-category approach in 1982, and he withdrew the proposed regulations.

The regulations finally adopted in 1982 provided that reductions be made from category I farms first, then category II farms, and then, if further reduction were necessary, the remaining reductions would be taken across-the-board from categories III and IV farms combined, so that the loss would be spread evenly among farmers in both categories.

In 1983, the Secretary again initially proposed regulations adopting the category-by-category approach, only to withdraw them and actually implement regulations adopting the across-the-board scheme. The Secretary decided, in the end, it would not be "fair" and "equitable" to adopt the category-by-category approach in 1983 either, since, *inter alia*, the statutory categorization scheme for 1983 was based on 1980–82 crop activity and thus farmers who leased their quotas prior to enactment of the 1981 Act had no opportunity to preserve their quota allotments in 1983 by farming their quota allotments on their own farms two of the three years prior to 1983.

The regulations promulgated in 1984— which are the subject of this lawsuit— adopted the category-by-category approach for crop years 1984 and 1985. The Secretary explained that the previous special treatment given category III farmers had not been "intended to abrogate the clear statutory schedule of priorities for reduction of poundage quotas as set forth in [the 1981 Act]," 49 Fed.Reg. 14283, and that the justification for the special treatment no longer existed:

> [b]ecause 'category 3' quotas were not broken out separately for reduction purposes for two crop years [that is, 1982, and 1983], no reductions in 'category 3'

quotas will now result strictly from cropping activities which preceded the enactment in 1981 of the statutory provisions with respect to quota reductions.... Also, the effect of quota losses on local communities where there are high concentrations of 'category 3' quotas is reduced since the amount of quotas considered to be in 'category 3' for the 1984 crop is considerably less in all major peanut growing regions than at the time the policy with respect to the 1982 and 1983 quota reductions was adopted.

*Id.* The Secretary also concluded that a continuation of the 1982–1983 across-the-board approach "would clearly be inequitable to quota holders in 'Category 4'" because "under the priorities set forth [in the 1981 Act] quota holders in 'Category 4' were in the most protected category...." *Id.*

Category III farmers were never given personal notice that the category-by-category approach would be implemented in 1984 and 1985. However, the Secretary indicated in the 1982 and 1983 regulations that the across-the-board approach applied for those years only.[3]

### B. *District Court Proceedings*

Appellants, who are all category III farmers, faced drastic reductions in or elimination of their quota allotments under the 1984 regulations. They filed suit in the United States District Court for the Southern District of Georgia against the United States, the Department of Agriculture and various federal officials. They claimed that (1) the Secretary abused his discretion in promulgating the 1984 regulations because the regulations conflict with the 1981 Act; and (2) under the 1984 regulations, their peanut quota allotments would be taken without due process of law in violation of the fifth amendment. They asked the

---

**3.** In the preamble to the 1982 final rules, the Secretary said,

> This rule will apply to the 1982 crop of peanuts only. It is anticipated that proposed regulations will subsequently be issued for the 1983 through 1985 crops of peanuts which will set forth procedures for reducing farm poundage quotas for all farmers, including those in the third category.

47 Fed.Reg. 15968–69.

In the preamble to the 1983 rule, the Secretary stated that category III and IV farms would be grouped together only "for one additional crop year," 48 Fed.Reg. 9217, and that "[f]or the 1984 and 1985 crops, the method for making poundage quota reductions set forth in the proposed rule [i.e., the category-by-category approach] is adopted." *Id.* at 9218.

district court to set aside the 1984 regulations, and enjoin the Secretary from making any reductions in peanut quota allotments until a "fair and equitable" method for implementing the regulations could be devised and until the Secretary provided personal notice of the planned reductions.

Appellants moved for a temporary restraining order barring implementation of the 1984 regulations or any other regulations that would "reduce the peanut quota allotments in a manner which is void for conflict with the statute." Record at 85. The district court treated the motion as one for a preliminary injunction, and held a hearing on the motion. He denied the request, holding that plaintiffs were not likely to succeed on the merits because (1) the Secretary did not abuse his discretion; and (2) there is no due process violation since plaintiffs do not have a protected property interest in the peanut quota allotments and, even if they did, publication of the regulations in the Federal Register provided adequate notice to satisfy due process. The court also held that appellants failed to establish that they would suffer irreparable harm should a preliminary injunction not be granted, and that a preliminary injunction against implementation of the 1984 regulations would run counter to the important public policy of reducing the peanut price support program.

## II. DISCUSSION

■■■ To obtain a preliminary injunction, appellants must show that (1) there is a substantial likelihood that they will prevail on the merits at trial; (2) they will suffer irreparable harm if they are not granted the injunctive relief; (3) the benefits the injunction will provide them outweigh the harm it will cause the appellees; and (4) issuance of the injunction will not harm public interests. *Cate v. Oldham*, 707 F.2d 1176, 1185 (11th Cir.1983); *Shatel Corp. v. Mao Ta Lumber and Yacht Corp.*, 697 F.2d 1352, 1354–55 (11th Cir. 1983). All four of these requirements must be met. The district court held that appellants failed to carry their burden of persuasion as to any of these requirements. We may not reverse the district court's order denying a preliminary injunction, unless the court abused its discretion. *United States v. Lambert*, 695 F.2d 536, 539 (11th Cir.1983); *Shatel Corp.*, 697 F.2d at 1354.

■■■ The trial court did not err in determining that appellants were not likely to succeed on the merits.[4] Indeed, in our opinion, it is clear that appellants' statutory construction and due process claims should be denied. We, thus, affirm the district court's order denying a preliminary injunction.[5] We also conclude that we should decide appellants' statutory construction and due process claims on the merits, since both sides' arguments go to the merits, no facts are at issue and the questions raised are purely legal ones.[6] We therefore now decide these claims on the merits, denying both of them as a matter of law.

4. On appeal, appellants direct their arguments exclusively to the trial court's holding that appellants are not likely to prevail on the merits. They offer no arguments as to why the court erred as to the other requirements. Upon our own review of the record, we are convinced that, not only did the court not err in determining that appellants were not likely to succeed on the merits, it also did not err in finding that the requirements of irreparable harm and consistency with public policy were not met.

5. Appellants' motion and appeal, seeking a preliminary injunction, are not moot, even though the 1984 regulations have been implemented for the 1984 crop year. The 1984 regulations are scheduled to be implemented for the 1985 crop year as well. Appellants assure us that the regulations have not yet been implemented for

1985, and the government has not indicated to the contrary. The record indicates that appellants' quota allotments would be reduced still further if the 1984 regulations are implemented for the 1985 crop year.

6. As a general rule, when an appeal is taken from the grant or denial of a preliminary injunction, the reviewing court will go no further into the merits than is necessary to decide the interlocutory appeal. *E.g., Securities & Exchange Commission v. Senex Corp.*, 534 F.2d 1240, 1241 (6th Cir.1976); *Industrial Bank of Washington v. Tobriner*, 405 F.2d 1321, 1324 (D.C.Cir.1968); 9 Moore, Federal Practice ¶ 110.25[1], at 269–70 (2d ed. 1983). However, this is a rule of orderly judicial administration only. *Section 1292(a)(1) of Title 28 of the United States Code*, which governs appeals of inter-

**1288**

## A. Statutory Construction

We hold that the 1984 regulations do not conflict with the 1981 Act, and thus that the Secretary did not abuse his discretion by promulgating them.

■ Initially we note that the Secretary's interpretation of the 1981 Act is entitled to deference: " 'construction of a statute by those charged with its execution should be followed unless there are compelling indications that it is wrong....' " *Columbia Broadcasting System, Inc. v. Democratic National Committee*, 412 U.S. 94, 121, 93 S.Ct. 2080, 2096, 36 L.Ed.2d 772 (1973) (quoting *Red Lion Broadcasting Co. v. FCC*, 395 U.S. 367, 381, 89 S.Ct. 1794, 1802, 23 L.Ed.2d 371 (1969)). Thus, this court "need not conclude that the agency construction was the only one it permissibly could have adopted to uphold the construction, or even the reading the court would have reached if the question initially had arisen in a judicial proceeding." *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, — U.S. —, 104

S.Ct. 2778, 2782 n. 11, 81 L.Ed.2d 694 (1984). *See also FEC v. Democratic Senatorial Campaign Committee*, 454 U.S. 27, 39, 102 S.Ct. 38, 46, 70 L.Ed.2d 23 (1981); *Zenith Radio Corp. v. United States*, 437 U.S. 443, 450, 98 S.Ct. 2441, 2445, 57 L.Ed.2d 337 (1978).

■ Appellant concedes that the plain language of the 1981 Act appears to direct the category-by-category approach, instructing that reductions be made first from category I farms, then category II, then category III, and then, if further reduction is still necessary, from category IV. Appellants' primary argument is that this reduction order is subject to the qualification that the reduction be "fair" and "equitable," and that the 1984 regulations are not "fair" and "equitable," because appellants and other farmers who leased their quota allotments were not personally notified in 1982 that the category-by-category approach would be applied in 1984 and 1985.[7] According to appellants, the notice had to be personal because peanut farmers could not be expected to keep abreast of

---

locutory orders denying/granting injunctions, grants the courts jurisdiction to reach the merits, at least where there are no relevant facts at issue and the matters to be decided are closely related to the interlocutory order being appealed. *Energy Action Educational Foundation v. Andrus*, 654 F.2d 735, 745 n. 54 (D.C.Cir.1980), *rev'd on other grounds*, 454 U.S. 151, 102 S.Ct. 205, 70 L.Ed.2d 309 (1981); *E.P. Hinkel & Co. v. Manhattan Co.*, 506 F.2d 201, 204 (D.C.Cir. 1974); *Mercury Motor Express, Inc. v. Brinke*, 475 F.2d 1086, 1091 (5th Cir.1973). *Cf.* 9 Moore ¶ 110.25[1], at 273 ("once a case is lawfully before a court of appeals, it does not lack power to do what plainly ought to be done"). Thus, courts may, and have, ruled on legal issues and claims on the merits in the course of reviewing interlocutory orders granting or denying preliminary injunctions. *E.g., United Parcel Service, Inc. v. United States Postal Service*, 615 F.2d 102, 107 (3d Cir.1980); *Noel v. Chapman*, 508 F.2d 1023 (2d Cir.), *cert. denied*, 423 U.S. 824, 96 S.Ct. 37, 46 L.Ed.2d 40 (1975). Appellate courts have even dismissed complaints on the merits when their examinations of the records revealed the entire case lacked merit. *Deckert v. Independence Shares Corp.*, 311 U.S. 282, 61 S.Ct. 229, 85 L.Ed. 189 (1940); *Triumph Hosiery Mills, Inc. v. Triumph International Corp.*, 308 F.2d 196, 200 (2d Cir.1962). At least one appellate court has entered judgment for the plaintiffs in an interlocutory appeal of an order denying a prelimi-

nary injunction when the court determined there were no issues of fact to be resolved, and upon the facts, plaintiffs were entitled to judgment as a matter of law. *Hurwitz v. Directors Guild of America, Inc.*, 364 F.2d 67, 70 (2d Cir.), *cert. denied*, 385 U.S. 971, 87 S.Ct. 508, 17 L.Ed.2d 435 (1966). Reaching the merits in cases such as these obviously serves judicial economy, as long as the facts are not disputed and the parties have presented their arguments to the court. We thus conclude that we have jurisdiction to reach the merits of some of appellants' claims, and that, under the circumstances, we should exercise our discretion and rule on those claims now.

7. Appellants also argue that the regulations are inconsistent with provisions of the 1981 Act (i.e., 7 U.S.C. § 1358a(a), (i), and (j)) that give quota holders the right to lease their marketing quotas for transfer and production to other producers on other land. However, these provisions vest broad discretion with the Secretary as to whether farmers may lease their quotas and the terms and conditions under which they may do so. Given this broad grant of discretion—as well as Congress' contemporaneous direction that the Secretary reduce the quotas of category III farms—the 1984 regulations do not conflict with the quota leasing provisions of the 1981 Act.

the various proposed regulations that had come out since enactment of the 1981 Act. The notice had to be given in 1982 (or earlier), because otherwise the peanut farmers would not have the opportunity to avoid loss of their quota allotments in 1984, by ending their leasing arrangements and producing their quota allotments on their own land for two of the three years prior to 1984.

In support of their position, appellants rely on the post-enactment comments of the members of Congress who objected to the category-by-category approach in 1982 and 1983, and to the Secretary's own interpretation of the Act, in 1982 and 1983, that adoption of the category-by-category approach would not be "fair" and "equitable." [8] Appellants maintain the Secretary and these members of Congress determined that the category-by-category approach was unfair and inequitable in 1982 and 1983 because farmers were not given adequate notice that such drastic quota reductions would be made and thus they had no opportunity to preserve their allotments. Appellants claim that peanut farmers also lacked adequate notice of and opportunity to prepare for the 1984 regulations since they were not personally notified in 1982 that the category-by-category approach would be applied in 1984 and 1985. According to appellants, if the category-by-category approach was not "fair" and "equitable" in 1982 and 1983 because of lack of notice and opportunity to prepare, it was inequitable in 1984 as well.

Appellants misconstrue the reasons given by the Secretary and members of Congress for determining that the category-by-category approach was unfair and inequitable in 1982 and 1983. They believed the approach was unfair and inequitable because quota reductions for those years would be based solely on pre-Act crop activity. Thus, farmers who leased their quotas during these pre-Act years had *no opportunity to know* of the consequences that would attach to their leasing activity as a result of passage of the 1981 Act.

Drastically reducing their quota allotments under such circumstances was determined to be unfair and inequitable. As interpreted by the Secretary and members of Congress, the Act's requirement of "fairness" and "equity" demanded only that farmers have *the opportunity to know* what consequences may attach to their leasing arrangements and that the reduction provisions of the Act not penalize pre-Act crop activity. Nothing they said indicates that "fairness" and "equity," as used in the statute, require that the farmers *in fact* know that consequences would attach to their post-Act crop activity.

Applying this interpretation of "fairness" and "equity" here, it is clear that it was "fair" and "equitable" to implement the category-by-category approach in 1984 and 1985. The 1984 regulations implemented the reductions on the basis of post-Act crop activity only (i.e., 1982 and 1983 crop activity). During the post-Act crop years farmers *had the opportunity to know* that if they continued to lease their quotas, they might well lose their quotas or have them reduced. The 1981 Act, by its very terms, directed that a category-by-category approach be implemented, and, at the very least, announced that farmers who leased their quotas were, by statute, exposed to reductions of their quotas. In the 1982 and 1983 regulations, the Secretary stated that the across-the-board approach applied for those years only.

In short, there is no indication that Congress intended its requirement of "fairness" and "equity" to translate into a requirement that farmers be given personal notice in 1982 that the category-by-category approach would be adopted in 1984. In the final analysis, appellants are really contending that before an act of Congress can become law, each person affected by it must be given personal notice of it. There is no sure requirement, nor did Congress intend to impose one in regard to the 1981 Act by including the words "fair" and "equitable." Given that peanut farmers had had the opportunity to know the conse-

---

**8.** We note there is no legislative history on the quota reduction provisions of the 1981 Act.

quences that would attach in 1984 and 1985 if they continued to lease their quotas in the post-Act years, the 1984 regulations implement the quota reductions on a "fair and equitable basis," as that requirement has been interpreted by the Secretary and members of Congress. We find no indication, much less a compelling one, that the Secretary's interpretation of the Act, as reflected in the 1984 regulations, conflicts with Congressional intent. *Columbia Broadcasting System, Inc.*, 412 U.S. at 121, 93 S.Ct. at 2095.

## B. *Due Process Claim*

Appellants maintain the 1984 regulations violated their fifth amendment due process rights because they take away their quota allotments without adequate notice. To establish a due process violation, appellants have to show (1) they have a protected property interest in the quota allotments; and (2) they were deprived of that interest by governmental action and without due process of law. *See Bishop v. Wood*, 426 U.S. 341, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976); *Paul v. Davis*, 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976). We hold that appellants do not have a protected property interest, and thus we need not consider whether appellants were afforded due process.

■■■ To have a fifth amendment property interest in a benefit, "a person ... must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." *Board of Regents v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972). Indeed, the hallmark of a protected property interest is "an individual entitlement grounded in ... law, which cannot be removed except 'for cause.'" *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 430, 102 S.Ct. 1148, 1155, 71 L.Ed.2d 265 (1982). The dimensions of a protected property interest are defined by the law that creates it. *Goss v. Lopez*, 419 U.S. 565, 571–73, 95 S.Ct. 729, 734–35, 42 L.Ed.2d 725 (1975); *Roth*, 408 U.S. at 577, 92 S.Ct. at 2709.

■■■ In the present context, the dimensions of a protected property interest in peanut quota allotments are defined by the 1981 Act, which created the national peanut quota. It is true, as appellants point out, that the Act provides that farms that received quotas during the 1981 crop year are to receive quotas during 1982 through 1985. 7 U.S.C. § 1358(m)(1). However, the Act also provides that in each year during the period 1982 through 1985 the national peanut quota is to be reduced in a specified amount, *id.* 1358(k), and it directs the Secretary to achieve these yearly reductions by reducing the quotas allotted to, among others, category III farmers. *Id.* 1358($l$)(2)(A). Further, the Act provides that the quota allotted a farm during the years 1982 through 1985 be that received in 1981 "as adjusted by" the Secretary's regulations implementing the yearly reductions in the national quota. *Id.* 1358(m). Thus, under the 1981 Act, which creates and defines their quota rights, appellants are entitled to their 1981 quota allotments as adjusted by the 1984 regulations, which, amounts to a nominal allotment or, in many cases, none at all. Appellants have no protected property interest in quotas *per se* nor in the specific quotas they had in 1983 or any other prior year.

## CONCLUSION

For the foregoing reasons, we AFFIRM the district court's order denying appellants' request for a preliminary injunction. We also hold, as a matter of law, that the 1984 regulations are not inconsistent with the 1981 Act and that implementation of these regulations does not violate due process.