899 F.2d 1154
 BRUNDIDGE BANKING COMPANY; Max C. Sconyers; and Lottie H.
Sconyers, Plaintiffs-Appellees,
v.
PIKE COUNTY AGRICULTURAL STABILIZATION AND CONSERVATION
COMMITTEE, etc., W.O. Hixon; Harold F. Lee; Jim M. Wilson,
all in their official capacities, etc., Joe Stevens, in his
official capacity, etc.; James H. Reeves, etc., et al.,
Defendants-Appellants.
 No. 89-7072.
 United States Court of Appeals,
Eleventh Circuit.
 May 1, 1990.
 
 1
 James E. Wilson, U.S. Atty., Montgomery, Ala., Kenneth E. Vines, John F. Cordes, Matthew M. Collette, U.S. Dept. of Labor, Civ. Div., Appellate Section, Washington, D.C., for defendants-appellants.
 
 
 2
 O.K. McDowell, Brundidge, Ala., pro se.
 
 
 3
 John B. Scott, Jr., Capell, Howard, Knabe & Cobbs, Montgomery, Ala., John B. Crawley, Crawley & Jarrell, Troy, Ala., Alvin T. Prestwood, Frank Caskey, Capouano, Wampold, Prestwood & Sansone, Montgomery, Ala., for plaintiffs-appellees.
 
 
 4
 Appeal from the United States District Court for the Middle District of Alabama.
 
 
 5
 Before JOHNSON, Circuit Judge, RONEY*, Senior Circuit Judge, and MELTON**, District Judge.
 
 MELTON, District Judge:
 
 6
 This appeal from the order of the district court setting a permanent peanut quota on a particular tract of land concerns the scope of judicial review and remedy for an aggrieved party who maintains that the peanut quota applied to the parts of a reconstituted farm was determined erroneously.
 
 
 7
 A tract of land known as the Ramage Place, situated in Pike County, Alabama, and listed in records of the Agricultural Stabilization and Conservation Service ("ASCS") as tract 823, came into the possession of O.K. McDowell, a defendant below who does not join this appeal, by way of inheritance in 1976. McDowell combined tract 823 with his other properties. ASCS identified the combined property as FSN G-56 and assigned a peanut quota to the farm as an entirety. In 1982, McDowell executed a mortgage to appellee Brundidge Bank ("the Bank") on the tract 823 portion of his farm; he subsequently lost the tract through foreclosure when he defaulted on his payments.
 
 
 8
 The underlying controversy grows out of the events surrounding the Bank's preparation for foreclosure and sale of tract 823. The Bank sought advice on the method by which appellant Pike County Agricultural Stabilization and Conservation Committee ("County Committee") would reallocate the peanut quota for FSN G-56 when tract 823 was separated from the farm through the foreclosure proceeding. The Bank suggested that the County Committee use the cropland method for allocating the quota. This method divides the quota assigned to the entire property using the proportion of cropland in the reconstituted farms relative to the amount of cropland in the original farm. If the cropland method was used to reallocate the quota for FSN G-56, tract 823 would receive a substantial share of the quota. The Bank preferred the cropland method because the alternative, the contribution method, would allocate the quota on the basis of a proportion derived from a comparison of the quota allotment, normal crop acreage and preceding year planted acreage that each piece of property being separated had at the time they were combined with the current quota allotment, normal crop acreage and preceding year planted acreage of the entire property. The Bank viewed the state of the records concerning FSN G-56 as too chaotic and uncertain to calculate the quota for the tract 823 portion of the entire property.[1] The Bank faced the distinct possibility that the contribution method would result in no quota for tract 823, an event that would diminish significantly the property's market value.
 
 
 9
 On May 5, 1986, the Bank made its initial inquiry of the Pike County ASCS Office. Officials of that agency advised the Bank that the cropland method would be used and they later estimated a quota using 1985 figures. A few days after the Bank received an estimated quota an official of the County Office called the Bank's chief executive officer and retreated from the previous representation that the cropland method would be used. Instead, the Bank was informed, a historical method would be employed and the tract would receive no quota. Discussions between the Bank and the County Executive Director culminated in the identification of regulatory authority that would permit the County Committee to impose the cropland method as necessary for a fair and equitable distribution under the circumstances. The Bank requested to meet with the County Committee for the purpose of presenting its case for the cropland method. At a formal hearing held May 21, 1986, the County Committee determined that it would use the cropland method, apparently grounding its decision on its reading of a manual based on 7 C.F.R. Sec. 719.8.
 
 
 10
 Following the foreclosure sale of tract 823 on May 28, 1986, at which the Bank bought the property, the Bank credited McDowell's account with the sale price less foreclosure expenses. This left a debt of approximately nine thousand dollars, which the Bank collected through a detinue action for cows previously pledged as additional security for the loan. The Bank communicated with the County Executive Director on three separate occasions during June and July to fix more precisely the amount of the quota that tract 823 would receive. The last of these communications, on July 29, 1986, was in anticipation of a sale of the property to appellees Max C. and Lottie H. Sconyers. After receiving confirmation of an estimated quota calculated by reference to the cropland method, the Bank sold tract 823 to the Sconyers.
 
 
 11
 McDowell subsequently registered his complaint with the County Committee that the contribution method should have been used to allocate the quota. The County Committee met first with McDowell on August 13, 1986, and then with him and the Bank's representatives two days later. The County Committee affirmed its decision to use the cropland method.
 
 
 12
 Timely appeal by McDowell to the Alabama State Agricultural Stabilization and Conservation Committee ("State Committee") followed. On October 9, 1986, the State Committee reversed the County Committee and directed that the contribution method should have been used. The Bank then took timely appeal to the Deputy Administrator of State and County Operations ("DASCO") of the ASCS, U.S. Department of Agriculture. On May 11, 1987, DASCO affirmed the State Committee's decision.
 
 
 13
 Suit in the district court ensued. Appellees/plaintiffs originally asserted jurisdiction pursuant to 7 U.S.C. Sec. 1365, the exclusive provision for statutory review of quota allocation decisions, and 28 U.S.C. Sec. 1331. It became apparent during the progress of the action, however, that 7 U.S.C. Sec. 1365 no longer applied to peanut quota determinations for the 1986 through 1990 crops by the terms of the Food Security Act of 1985, Pub.L. 99-198, tit. VII, Sec. 701(4), 99 Stat. 1430 (1985).[2] The district court permitted amendment of the complaint to assert jurisdiction under the Administrative Procedure Act, 5 U.S.C. Secs. 701, et seq. Appellants/defendants unsuccessfully argued that 7 U.S.C. Sec. 1385 precluded any judicial review whatsoever, but the district court did find that the section reduced the scope of its review.
 
 
 14
 On the merits of the suit, the district court declined to address whether the State Committee and DASCO were correct in imposing the contribution method in lieu of the County Committee's decision to use the cropland method. Instead, the district court observed that DASCO found that the County Committee had "erred" in promising use of the cropland method. This admission, the district court reasoned, dovetailed with the program of reserve for the correction of error, 7 C.F.R. Sec. 729.322. The district court ordered relief out of this reserve in the form of a permanent quota for tract 823.
 
 
 15
 The central issue on appeal is the propriety of the relief granted by the district court. We reverse, and remand for further proceedings. Section 729.322 does not independently authorize the relief obtained below. The decision by DASCO to affirm the State Committee's reversal of the County Committee should be subject to review unconstrained by 7 U.S.C. Sec. 1385, a review best left to the district court in the first instance.
 
 
 16
 We begin by an examination of section 729.322. Titled "Reserve for corrections," this regulation has two parts. In subsection 729.322(a), directions are given for the calculation from year to year of a reserve established "[f]or purposes of correcting quota allocation errors...." Subsection 729.322(b) provides that "in establishing the reserve, the State committee shall hold an amount that is estimated to be sufficient to satisfy the need to correct errors based on past history of appeals and other appropriate factors." This subsection further describes how a state committee should recalculate quota allocations if the reserve is inadequate.
 
 
 17
 A natural reading of section 729.322 suggests that it provides where to turn to find an available quota allocation in order to correct an error, but not how to determine when an error that is eligible for such an allocation has been made. While the past history of appeals is stated as a factor to consider in the calculation of the reserve, the regulation does not reveal how the appeals process culminates in an award from the reserve. It would seem likely that other sections must be consulted to uncover the criteria for an award from the reserve.
 
 
 18
 The district court's reasoning apparently finds implied authority for making an award in section 729.322 and applies an estoppel theory in doing so. The core of the argument is completely stated in a few brief passages that are worth repeating here:
 
 
 19
 Where, as here, a quota is divided more than six years after the underlying property was first combined, 7 C.F.R. 719.8 expressly precludes use of the cropland method by the County Committee without the State Committee's concurrence. Nevertheless, without seeking the approval of the State Committee, the County Committee four times reiterated to the Bank that the cropland method would be used to determine the peanut quota for tract 823. It is undisputed that the County Committee erred in making these representations; even DASCO admits this to be the case.
 
 
 20
 While defendants concede that error occurred, they assert that, because the County Committee exceeded its authority in making the misrepresentations to the Bank, the plaintiffs are precluded from obtaining relief. The court disagrees. First, the plaintiffs herein are not requesting damages. Second, 7 C.F.R. 729.322 explicitly allows relief in cases such as this one, and does not distinguish between errors made within authority and errors made outside authority.
 
 
 21
 Not only did the County Committee err in this case, but the plaintiffs were clearly justified in acting in reliance--and in fact did so, to their detriment--on the County Committee's representations that tract 823 had a substantial peanut quota.
 
 
 22
 ....
 
 
 23
 In relying on the County Committee's repeated representations, ... the Bank lost the difference between tract 823's value with and without its peanut quota.
 
 
 24
 Moreover, in reliance on the County Committee's advice, the Bank contracted to sell tract 823 to the Sconyers for a price based on the property having a peanut quota of approximately 70,000 pounds. While it is unclear to the court whether the Bank or the Sconyers will eventually take the loss, it is clear that someone among the plaintiffs will have been unfairly damaged through their reliance on the County Committee's erroneous representations.
 
 
 25
 This court thus finds the plaintiffs to be entitled to relief under the provisions of 7 C.F.R. 729.322, and the ASCS must be ordered to allocate tract 823 a permanent peanut quota.
 
 
 26
 (footnotes omitted) (emphasis in original).
 
 
 27
 The district court's analysis strives for an equitable result in the instant case, but it does so at the expense of future cases. The concept of "error" is expanded to encompass all mistakes of a county committee if a successful appeal from the "erroneous" decision is taken. Presumably, some element of reliance must be present, such as the planting of a crop, renting of the parcel, or, as in this case, sale of the subject property. Moreover, the award to "correct the error" is made without regard to the culpability of the respective parties in the creation of the circumstances that are in dispute.[3] The suggestion of such extraordinarily generous terms under which the reserve may be tapped should be recognized only if they have a firm basis in the regulatory scheme. They do not.
 
 
 28
 We find merit in appellants' argument that this approach does not correct errors, it compounds them. The order of relief from the reserve confers a substantial quota on tract 823 based on the cropland method of calculation. At the same time, DASCO's disposition of the appeal applies the contribution method to the calculation of the quota for the parent farm. The reconstitution of FSN G-56 thus yields two farms with a combined quota greater than the quota for the original farm. This result transgresses the statutory mandate to divide the quota between the separated tract and the parent farm. See 7 U.S.C. Sec. 1379(a); see also 7 C.F.R. Sec. 719.8.
 
 
 29
 An examination of the text of section 729.322, as it fits into the remainder of the regulatory scheme, suggests the inappropriateness of using the reserve as a basis for relief in the present case. The reference to the purpose of "correcting quota allocation errors" might seem on its face to support the use of the reserve as the district court did. On further examination, however, it appears that the regulations contemplate a difference between farm reconstitution decisions and quota allocations. The latter phrase refers to the annual decision to divide a state's share of the national peanut quota among the eligible farms in that state.
 
 
 30
 Several sources urge this conclusion, most notably the arrangement of the two sets of regulations in the Code of Federal Regulations. Farm reconstitution regulations are contained in 7 C.F.R. Part 719 and apply to all programs administered by ASCS. The reserve for error correction in the peanut quota allocation program is unique to it (no other price support program has a similar reserve) and contained within 7 C.F.R. Part 729, where it has been twice revised since its inception. Part 729, moreover, sets forth procedures for quota allocation. These procedures include regulations to distinguish errors for which the cost of correction is borne by the farm operator from those which may be eligible for correction from the reserve. See, e.g., 7 C.F.R. Sec. 729.337 (erroneous notice of effective farm poundage quota); see also id. Sec. 729.355 (county committee error approving transfer of poundage quota). The errors covered by the regulations do not encompass an allegedly erroneous farm reconstitution decision because that decision goes to a matter that is taken as given when quotas are allocated. Cf. id. Secs. 729.328(c), 729.329(d), 729.331(d) (when farm is reconstituted, allocation of state poundage increase or reduction, and reallocation of released quotas, is based on constitution of farm in preceding year). That is, the poundage quota on tract 823 is not in error for purposes of section 729.322 if the quota has been calculated, otherwise correctly, on the basis of an erroneous reconstitution of FSN G-56.
 
 
 31
 The reserve for correction of errors is concerned with each farm's share of the state's share of the national peanut quota. Subsection 729.322(b) evinces this focus. Although each state calculates its reserve with an eye to the "past history of appeals and other appropriate factors," a miscalculation that leaves the reserve substantially short of correcting all errors may result in the recalculation of all quotas in the state. In other words, the reserve is a buffer between the determination of individual farm poundage quotas and the state poundage quota. The sum of the former may not exceed the latter. A reserve is necessary to avoid the cumbersome and destabilizing process of recalculating every farm's quota following the discovery of an error regarding a single quota.
 
 
 32
 From this perspective, it is apparent that the reserve is not designed to remedy problems arising from reconstitution decisions. Reconstitution is the division between tracts of the parent farm and properly pits the tracts against each other for shares of the allotment. Use of the reserve to remedy a problem arising from reconstitution effectively pits the tracts of the parent farm against the remainder of the farms in the state. That result is unreasonable and compels a narrow construction of the reserve regulation.
 
 
 33
 The historical context of section 729.322 and its predecessor regulations confirms the textual analysis. The establishment of the state reserve system dates to the direction in the Agriculture and Food Act of 1981 to reduce the national peanut quota. See generally Callaway v. Block, 763 F.2d 1283 (11th Cir.1985) (upholding regulations promulgated as 7 C.F.R. Part 729, as adopted in 1984, against challenge on grounds of statutory construction and due process). The process of reduction involved judgments concerning a fair and equitable basis for each farm's lower quota. See id. State reserves for the correction of errors were proposed, and implemented, to assist in the accomplishment of the fair and equitable reductions. See 47 Fed.Reg. 15969 (1982) (commenting on 7 C.F.R. Sec. 729.122). The extension of the initial reserves to the 1983 through 1985 crops continued the theme that the reserves existed "for correcting errors in the calculation of quota reductions." 48 Fed.Reg. 9218 (1983) (commenting on 7 C.F.R. Sec. 729.222). Section 729.322, adopted in 1986, changes the method for calculating the quantity in the reserve,[4] but the commentary accompanying the final regulation does not single out the revision for any comment and generally describes the current regulations as based on the earlier regulations, with necessary modifications to adhere to the Food Security Act of 1985. This history strongly indicates a dedication of section 729.322 to the correction of quota errors when individual farms are adjusted in accord with the state's quota. The context does not provide any inference that the reserve exists as source by which aggrieved individuals can seek relief when they have relied on the representations of a county committee regarding the method that will be used in a reconstitution decision.
 
 
 34
 We observe that the Secretary of Agriculture has promulgated regulations that provide criteria to evaluate the propriety of relief for the kind of hardship the Bank claims it has suffered. Part 790 of Title 7 of the Code of Federal Regulations is addressed to "Incomplete Performance Based Upon Action or Advice of an Authorized Representative of the Secretary." The conditions set forth in the regulations conflict with the more liberal conditions enforced by the district court. Section 790.2(a) empowers DASCO, among others, to confer relief for "performance rendered in good faith in reliance upon action or advice of any authorized representative of a county committee" with "price support ... extended or payment ... made thereon in accordance with such action or advice to the extent it is deemed desirable in order to provide fair and equitable treatment." However,
 
 
 35
 [t]he provisions of this part shall be applicable only if a producer relied upon action or advice of a county or State committee or an authorized representative of such committee in rendering performance which the producer believed in good faith met the requirements of the applicable program. The authority provided in this part does not extend to cases where the producer knew or had sufficient reason to know that the action or advice of the committee [or] its authorized representative upon which he relied was improper or erroneous, or where the producer acted in reliance on his own interpretation of programs provisions, notices or advice.
 
 
 36
 7 C.F.R. Sec. 790.2(b). The broad concept of "error" imposed by the district court would render this provision irrelevant and meaningless. Because the regulation is the reasonable implementation of a statute, 7 U.S.C. Sec. 1339a, we reject the less soundly based construction of section 729.322 used by the district court and adopt one consistent with the remainder of the regulatory framework, as already described.
 
 
 37
 The district court's decision might be read as an application of estoppel theory, a proposition argued by appellants. The noticeable lack of the mention of the word "estoppel" or citations to estoppel cases leads us to conclude more readily that estoppel factors were merely an element of the court's interpretation of section 729.322. We nonetheless briefly address appellants' concern that estoppel principles are at play.
 
 
 38
 The County Committee's actions in determining a peanut poundage quota are part of the properly delegated function of operating the federal price control system. As a consequence, application of estoppel against the alleged error must be evaluated as it is for a sovereign function of the federal government. To the extent that estoppel is available in such situations, see, e.g., Heckler v. Community Health Servs., 467 U.S. 51, 60-61, 104 S.Ct. 2218, 2224, 81 L.Ed.2d 42 (1984); Federal Crop Ins. Corp. v. Merrill, 332 U.S. 380, 68 S.Ct. 1, 92 L.Ed. 10 (1947); Richmond v. Office of Personnel Mgmt., 862 F.2d 294, 296-301 (Fed.Cir.1988), cert. granted, --- U.S. ----, 110 S.Ct. 46, 107 L.Ed.2d 15 (1989), at a minimum the traditional elements of common law estoppel must be satisfied, Community Health Servs., 467 U.S. at 61, 104 S.Ct. at 2224.
 
 
 39
 The successful assertion of estoppel in this case requires that the Bank have reasonably relied on the County Committee's promise or misrepresentation to the Bank's detriment. See, e.g., Organized Fishermen of Fla. v. Hodel, 775 F.2d 1544, 1549 (11th Cir.1985), cert. denied, 476 U.S. 1169, 106 S.Ct. 2890, 90 L.Ed.2d 978 (1986). As a matter of law, however, reasonable reliance can take place only if the government's agents act within their lawful authority. "[T]hose who deal with the Government ... may not rely on the conduct of Government agents contrary to law." Community Health Servs., 467 U.S. at 63, 104 S.Ct. at 2225 (footnote omitted).
 
 
 40
 [A]nyone entering into an arrangement with the Government takes the risk of having accurately ascertained that he who purports to act for the Government stays within the bounds of his authority. The scope of this authority may be explicitly defined by Congress or be limited by delegated legislation, properly exercised through the rule-making power. And this is so even though ... the agent himself may have been unaware of the limitations upon his authority.
 
 
 41
 Merrill, 332 U.S. at 384, 68 S.Ct. at 3. Estoppel is relevant in this case to the extent that the County Committee exceeded its lawful authority, leaving the Bank without other means of redress for the decisions of the State Committee and DASCO. It is precisely those same circumstances that bar a claim of reasonable reliance and consequently assertion of estoppel itself.[5]
 
 
 42
 Having found the district court's order insupportable either under section 729.322 or principles of estoppel, we reverse and remand for review of the administrative decision on its merits. In doing so, we are compelled to correct a holding in the district court's order which, if applied on remand, may raise a new error on a subsequent appeal. The issue concerns the application of 7 U.S.C. Sec. 1385 to the review of the administrative decision. The district court held that the statute curtailed the scope of, but did not bar, its review. This ruling is in error; section 1385 does not apply to this case.
 
 
 43
 The controversy began with appellees/plaintiffs' amendment of their complaint to disavow reliance on 7 U.S.C. Sec. 1365 as a jurisdictional basis for their action. Appellants/defendants subsequently asserted that the congressional suspension of the application of section 1365 to the peanut program brought section 1385 to bear by default. They argued that because allotment of a peanut quota determines the level of price support for a farm, the determination of the reconstitution of FSN G-56 involved "facts constituting the basis for any ... price support operation, or amount thereof," that are "final and conclusive and shall not be reviewable by any officer or agency of the Government." 7 U.S.C. Sec. 1385.
 
 
 44
 The district court held that section 1385 applied to the action. The court viewed the statute as establishing three categories of programs included in its scope, including "any loan, or price support operation, or the amount thereof, when officially determined in conformity with the applicable regulations prescribed by the Secretary...." It seemed self-evident to the court that the quoted portion of the statute applied. The court limited the effect of the statute, however, to actual factual findings by DASCO, leaving for the court the legal conclusions that could be derived therefrom.
 
 
 45
 We disagree with the district court's construction of the statute's application. Prior to the congressional suspension of subpart I of part C of subchapter II of the Agricultural Adjustment Act of 1938, 7 U.S.C. Secs. 1361-1368, this action would have proceeded under different procedures, culminating in court review pursuant to section 1365. See, e.g., Chandler v. David, 350 F.2d 669 (5th Cir.1965), cert. denied, 382 U.S. 977, 86 S.Ct. 548, 15 L.Ed.2d 469 (1966); Crolley v. Tatton, 249 F.2d 908 (5th Cir.1957), cert. denied, 356 U.S. 966, 78 S.Ct. 1005, 2 L.Ed.2d 1073 (1958); Schild v. Busch, 293 F.Supp. 1353 (S.D.Tex.1968); Gladney v. Review Committee, 257 F.Supp. 57 (W.D.La.1966), aff'd, 380 F.2d 929 (5th Cir.1967), cert. denied, 389 U.S. 1036, 88 S.Ct. 770, 19 L.Ed.2d 824 (1968). Review by the court would be limited under the terms of section 1366 "to questions of law, and the findings of fact by the review committee, if supported by evidence, [would] be conclusive." More importantly, however, section 1367 expressly conferred exclusive jurisdiction for review proceedings to the subpart.
 
 
 46
 Plainly, then, section 1385 would have no effect if section 1365 provided the vehicle for review of the administrative decision. Cf. Jones v. Hughes, 400 F.2d 585, 588-90 (8th Cir.1968); Garvey v. Freeman, 397 F.2d 600, 604-05 (10th Cir.1968). The question is whether congressional suspension of section 1365 thereby imposed the limits on review contained in section 1385. We answer this question in the negative. Two considerations are particularly powerful. We address each in turn.
 
 
 47
 First, the changes made by Congress suggest no intent to apply section 1385 to peanut quota allocations. Given the change in the standard of review effected by resort to section 1385, we would expect to find legislative history on the subject. Cf. Japan Whaling Ass'n v. American Cetacean Soc., 478 U.S. 221, 230 n. 4, 106 S.Ct. 2860, 2866 n. 4, 92 L.Ed.2d 166 (1986) (review of agency action generally available "absent clear and convincing evidence of legislative intent to preclude it"). There is none. The changes enacted by Congress strongly suggest that this is not an oversight. Congress prescribed a standard of review for findings by the Secretary of Agriculture regarding the assessment of marketing penalties. See 7 U.S.C. Sec. 1359(l )(4) (1982 through 1985 crops); id. Sec. 1359(s)(4) (1986 through 1990 crops). We infer that Congress enacted as much as it intended and intended as much as it enacted. The suspension of section 1365 without a substitute measure was not intended to impose section 1385 by default.
 
 
 48
 Second, the history of section 1385 demonstrates that it is error to read the reference to "price support operation" as literally as the district court did. This phrase did not appear in the original form of the statute, which applied to "any Soil Conservation Act payment, parity payment, or loan, or the amount thereof, when officially determined in conformity with the applicable regulations prescribed by the Secretary," Agricultural Adjustment Act of 1938, ch. 30, Sec. 385, 52 Stat. 68 (1938). An amendment ten years later, section 207(e) of the Agricultural Act of 1948, ch. 827, 62 Stat. 1257 (1948), struck out "or loan" and substituted "loan, or price support operation." Thereafter, a series of amendments added specific references to the wheat, feed grain, cotton, and rice price support programs.[6] In each instance, the legislative history reflects an intention to bring the listed program under the authority of section 1385.[7] In 1977, the language of the statute was conformed to its present terms (excluding the reference to extra long staple cotton, which was not added until 1985) on a temporary basis, see Food and Agriculture Act of 1977, Pub.L. 95-113, tit. IV, Sec. 405, 91 Stat. 927 (1977), made permanent in 1981, see Agriculture and Food Act of 1981, Pub.L. 97-98, tit. XI, Sec. 1102, 95 Stat. 1263-64 (1981). This evolution in the terms of section 1385 illustrates the limited meaning that must be placed on the phrase "price support operation." If the phrase applied in the literal sense, then the several additions of specific crop program references were redundant and unnecessary.[8] We do not presume that Congress has engaged repeatedly in meaningless legislative exercises. We therefore reject an interpretation of "price support operation" that includes the peanut poundage quota allocation determination at issue here.[9]
 
 
 49
 Appellants raise a miscellany of issues relating to the reviewability of DASCO's decision under the Administrative Procedures Act. These concern whether appellees may assert a basis for relief pursuant to 7 C.F.R. Sec. 790.2. Appellees likewise urge affirmance of the district court on the basis of the same regulation. By their terms, however, section 790.2 and its authorizing statute, 7 U.S.C. Sec. 1339a, come into play only when relief would not otherwise be available under any other statute or regulation. See United States v. Kopf, 379 F.2d 8, 14 (8th Cir.1967). It is premature for us to rule on the availability, or unavailability, of relief under section 790.2 until the district court, on remand, has reviewed the merits of DASCO's decision. In the event the district court finds no basis for relief for appellees under any other applicable statute or regulation, that court may then entertain argument on the application of section 790.2.
 
 
 50
 In accordance with the foregoing, the order and decision of the district court is REVERSED and this case is REMANDED for further proceedings not inconsistent with this opinion.
 
 
 
 *
 See Rule 34-2(b), Rules of the U.S. Court of Appeals for the Eleventh Circuit
 
 
 **
 Honorable Howell W. Melton, U.S. District Judge for the Middle District of Florida, sitting by designation
 
 
 [1]
 McDowell maintained throughout the administrative appeals that tract 823 had no quota allotment at the time he acquired it and the Bank was aware of this fact when it received a mortgage on the property
 
 
 [2]
 The 1985 Act simply extended the exemption first established for the 1982 through 1985 peanut crops in the Agriculture and Food Act of 1981, Pub.L. 97-98, tit. VII, Sec. 701(4), 95 Stat. 1248 (1981)
 
 
 [3]
 In the instant case, the Bank's culpability might be drawn into question on the matter of the justification for its reliance. There is no indication in the record that the Bank made inquiry whether the State Committee had, as required, given its consent to use of the cropland method. Certainly the Bank should not receive the benefit of reliance on the County Committee's representations if it knew, as it should have, that the State Committee had to be consulted, but did not gain assurance that the requisite consents had been obtained. In addition, the Bank's expectation is severely undercut if, as DASCO found, tract 823 had no peanut quota prior to its combination into FSN G-56 and, as McDowell claimed, the Bank knew this when the tract was mortgaged
 Conversely, McDowell's culpability might be drawn into question on the matter of his knowledge of the Bank's expectation of receiving a quota based on the cropland method. McDowell received the benefit of the Bank's expectation in the form of a higher price for tract 823 credited against his loan obligation to the Bank. If McDowell had actual knowledge of the Bank's expectation and consequently waited in the wings to assert his right to division based on the contribution method, it would seem inequitable to permit him to keep the benefits from both the sale of tract 823 and the contribution method for allocating his quota.
 
 
 [4]
 Both sections 729.122 and 729.222 use a percentage of the state quota as the figure for the amount in the reserve. Section 729.322(a) changes the formula, depending upon whether the state's quota has increased or decreased from the preceding year. This change flows naturally from the changes in 1985 Act that created the prospect that some state quotas would, after several years of decreases, finally increase. Section 729.322(b) also added the provision for a portion of the reserve calculated on the history of appeals and other appropriate factors. This change makes sense from the perspective of the evolution of the peanut program. The changes from 1981 to 1985 were a departure from prior practice and somewhat of an experiment to reform the price support programs. There was no history of appeals to use as a factor for calculating the reserve and, at the time sections 729.122 and 729.222 were drafted, the future of the program remained uncertain. Section 729.322(b), then, can be seen as a refinement of the process of retaining a reserve for the adjustment of quota reduction errors
 
 
 [5]
 The record gives no hint of affirmative misconduct that might alter the traditional estoppel analysis. We again have no occasion to consider whether such an exception should exist in the Eleventh Circuit. See Eagle v. Sullivan, 877 F.2d 908, 912 n. 7 (11th Cir.1989); George v. Railroad Retirement Bd., 738 F.2d 1233, 1237 (11th Cir.1984)
 
 
 [6]
 Food and Agriculture Act of 1962, Pub.L. 87-703, tit. III, Sec. 322, 76 Stat. 626 (1962) (wheat acreage diversion program); Agricultural Act of 1964, Pub.L. 88-297, tit. I, Sec. 102, 78 Stat. 174 (1964) (cotton payment in kind program); Agricultural Act of 1970, Pub.L. 91-524, tit. IV, Sec. 404(5) (wheat and feed grain set-aside program), tit. VI, Sec. 605(3) (cotton set-aside program), 84 Stat. 1366, 1378 (1970); Rice Production Act of 1975, Pub.L. 94-214, tit. III, Sec. 302, 90 Stat. 187 (1976) (rice program); Food Security Act of 1985, Pub.L. 99-198, tit. X, Sec. 1017(a), 99 Stat. 1459 (1985) (extra long staple cotton program)
 
 
 [7]
 See S.Rep. No. 1787, 87th Cong., 2d Sess. (1962), reprinted in 1962 U.S.Code Cong. & Admin.News 2662, 2685 ("Section 322 of the bill would amend [7 U.S.C. Sec. 1385] ... to include wheat diversion payments under the bill."); S.Rep. No. 874, 88th Cong., 2d Sess. (1964), reprinted in 1964 U.S.Code Cong. & Admin.News 2130, 2149 ("Section 102 makes applicable to the payments [in kind program for cotton producers], existing provisions of law relating to the finality of determinations respecting program payments generally."); S.Rep. No. 1154, 91st Cong., 2d Sess. (1970), reprinted in 1970 U.S.Code Cong. & Admin.News 4788, 4815 (section 404(5) provides for "[e]xtension of the current provision for finality of payments to payments (including certificates) under the wheat and feed grain set-aside programs."); id. at 4827 (section 605(3) "amends the Agricultural Adjustment Act of 1938 ... to make [7 U.S.C. Sec. 1385] (finality of payments) applicable to payments under the cotton set-aside programs provided for by the bill."); H.Rep. No. 618, 94th Cong., 2nd Sess. 10 (1975), reprinted in 1976 U.S.Code Cong. & Admin.News 251, 259 (section 302 "makes effective for the 1976 and 1977 crops of rice the finality provisions of [7 U.S.C. Sec. 1385] applicable to determinations under the rice program."); see also H.Rep. No. 348, 95th Cong., 1st Sess. 80 (1977), reprinted in 1977 U.S.Code Cong. & Admin.News 1704, 1781 ("The provision extended makes clear that [7 U.S.C. Sec. 1385] applies to payments under the wheat and feed grain set-aside programs."); S.Rep. No. 145, 99th Cong., 1st Sess. 437 (1985), reprinted in 1985 U.S.Code Cong. & Admin.News 1103, 1676, 2103 ("Section 1303(a) amends [7 U.S.C. Sec. 1385] to expand the applicability of the provisions relating to the finality of facts concerning payments and loans to include extra long staple cotton, in addition to wheat, feed grains, upland cotton, and rice.")
 
 
 [8]
 The district court arrived at its reading of the section by applying the general rule of reading the disjunctive "or" as creating distinct categories. We agree that "or" normally should be read in this fashion, see, e.g., In re Burns, 887 F.2d 1541, 1545 (11th Cir.1989), but we disagree with the district court's choice of disjunctive groupings. Based on the legislative history, it appears that "or" defines categories of "any payment ..., any loan, or price support operation, or the amount thereof," as they relate to the specified crop programs. Our reading better fits the section as amended in 1948, along with its legislative history, see H.Conf.Rep. No. 2448, 80th Cong., 2d Sess. (1948), reprinted in 1948 U.S.Code Cong. & Admin.News 2325, 2327 (describing section 202 of that Act as authorizing "[p]rice support of any agricultural commodity through loans, purchases, payments, or other operations"), and subsequent congressional understanding of the section, see, e.g., S.Rep. No. 1787, 87th Cong., 2d Sess (1962), reprinted in 1962 U.S.Code Cong. & Admin.News 2662, 2685 (explaining section 1385 as applying to "the basis for certain Federal payments and loans"); S.Rep. No. 126, 97th Cong., 1st Sess. 181-82 (1981), reprinted in 1981 U.S.Code Cong. & Admin.News 1965, 2145-46 (section 1385 "generally provides that the facts constituting the basis for payments, loans, or price support operations authorized by various statutes shall be final and conclusive and not reviewable by any other officer or agency of the Government.")
 
 
 [9]
 Indeed, the present appeal is not a challenge to a payment made under any price support operation. Cf. Jones v. Hughes, 400 F.2d 585, 589 (8th Cir.1968) (section 1385 does not apply to notice of compliance with cotton acreage allotment). The finality provision of section 1385 has the salutary effect of eliminating collateral issues in payment challenges, such as the validity of a quota allocation. These collateral issues may have been subject to appeal at an earlier time, and the finality provision ensures that the matters that should have been raised earlier are not bootstrapped into subsequent litigation. See, e.g., Madsen v. Dep't of Agriculture, 866 F.2d 1035, 1036-37 (8th Cir.1989). A timely appeal of the initial determination, as in this case, does not implicate these finality concerns. Accordingly, we look to section 1385 only when cases involve a challenge to the fact or amount of a payment, loan or similar price support operation. See, e.g., Esch v. Yeutter, 876 F.2d 976, 990-91 (D.C.Cir.1989); United States v. Batson, 706 F.2d 657, 684-85 (5th Cir.1983), following remand, 782 F.2d 1307, 1311-12, cert. denied, 477 U.S. 906, 106 S.Ct. 3277, 91 L.Ed.2d 567 (1986); Gross v. United States, 676 F.2d 295, 299 n. 9 (8th Cir.1982); Aycock-Lindsey Corp. v. United States, 171 F.2d 518, 522 (5th Cir.1948)