**OFC COMM BASEBALL, an unincorporated association doing business as Major League Baseball; Natl Basketball Assn, a joint venture; Natl Collegiate Athletic Assn, an unincorporat-**

ed association; Natl Football League, an unincorporated association; Natl Hockey League, an unincorporated association, Appellants,

v.

Jack A. MARKELL, Governor of the State of Delaware; Wayne Lemons, Director of the Delaware State Lottery Office, Appellees.

No. 09–3297.

United States Court of Appeals, Third Circuit.

Argued Aug. 24, 2009.

Filed: Aug. 31, 2009.

Kenneth J. Nachbar [Argued], Pauletta J. Brown, Megan W. Cascio, Susan W. Waesco, Morris, Nichols, Arsht & Tunnell, Wilmington, DE, for Appellants.

Andre G. Bouchard [Argued], Joel E. Friedlander [Argued], Sean M. Brennecke, David J. Margules, Bouchard, Margules & Friedlander, Wilmington, DE, for Appellees.

Before McKEE, FUENTES and HARDIMAN, Circuit Judges.

## OPINION OF THE COURT

HARDIMAN, Circuit Judge.

In this interlocutory appeal we review an order of the United States District Court for the District of Delaware denying a motion for preliminary injunction filed by the National Football League, the National Basketball Association, the National Hockey League, the Office of the Commissioner of Baseball, and the National Collegiate Athletic Association (collectively, Leagues). The Leagues sought to enjoin Delaware state officials from implementing certain elements of its Sports Lottery Act (Act), Del. Laws Ch. 28 (H.B. No. 100) (2009), 29 Del.Code § 4801 *et seq.*, on September 1, 2009. As we shall explain, we need not decide whether the District Court's denial of the Leagues' preliminary injunction was proper because we hold as a matter of law that elements of Delaware's sports lottery violate federal law.

### I.

In March 2009, the Governor of Delaware, Jack Markell, proposed legislation authorizing sports betting and table gaming at existing and future facilities in Delaware. On March 19, Governor Markell sought an advisory opinion from the Delaware Supreme Court pursuant to 10 Del. Code § 141 and 29 Del.Code § 2102, regarding the constitutionality of his proposal under the Delaware Constitution. In a letter to the Delaware Supreme Court, Governor Markell described three types of proposed sports gambling: (1) point-spread bets on individual games; (2) over/under bets on individual games; and (3) multi-game parlay bets.[1] On May 14— while the request for an advisory opinion from the Delaware Supreme Court was pending—Governor Markell signed the Act into law. *In re Request of Governor for an Advisory Opinion (In re Request of Governor)*, —— A.2d ——, No. 150, 2009, 2009 WL 1475736, at *2 (Del. May 27, 2009).

After hearing oral argument, the Delaware Supreme Court issued an opinion on May 29, which found that multi-game betting would not violate state law. In ana-

---

**1.** Under regulations proposed pursuant to the Act, Delaware intends to offer three games: Single Game Lottery, Total Lottery, and Parlay Lottery. In Single Game Lottery, bettors must select the winning team in a single sports contest against a point spread. In Total Lottery, the bettor gambles on whether the total number of points scored by both teams in a single contest will be over or under a specified sum. The final game, Parlay Lottery, combines elements of the first two games in asking bettors to correctly choose the winners of two or more sports contests, or two or more over/under bets, or some combination of winners and over/under bets.

lyzing the legality of the Act and the "lotteries" proposed pursuant to the Act, the Delaware Supreme Court relied heavily on Judge Stapleton's decision in *National Football League v. Governor of the State of Delaware* (*NFL*), 435 F.Supp. 1372 (D.Del. 1977). That case concerned the NFL's challenge to a sports betting scheme known as "Scoreboard" that Delaware conducted during the 1976 season. Scoreboard was comprised of three games: Football Bonus, Touchdown, and Touchdown II. In Football Bonus, the State offered two pools of seven NFL games each and bettors had to predict the winners—without a point spread—in one or both of the pools. In Touchdown, bettors selected both the winners and point spreads for either three, four, or five NFL games. Finally, Touchdown II—which replaced Touchdown midway through the season—required bettors to pick the winners, against the point spread, for between four and twelve NFL games. All of the Scoreboard games conducted in 1976 were confined to betting on the NFL, and all required that the bettor wager on more than one game at a time.

In *NFL*, Judge Stapleton held such wagering was permissible under the Delaware Constitution because chance is the "dominant factor" in multi-game (parlay) betting. The Delaware Supreme Court reached the same conclusion in its advisory opinion, *In re Request of Governor*, 2009 WL 1475736, at *8, but did not decide the constitutionality of single-game betting, except to recognize that it differs from the parlay games addressed by Judge Stapleton. *Id.* The Delaware Supreme Court did not address the federal statutory question presented in this appeal.

Following receipt of the Delaware Supreme Court's advisory opinion, on June 30 the State published its proposed regulations to implement the Act (Regulations). According to the Regulations, Delaware intends to implement a sports betting scheme that would include wagers "in which the winners are determined based on the outcome of any professional or collegiate sporting event, including racing, held within or without the State, but excluding collegiate sporting events that involve a Delaware college or university, and amateur or professional sporting events that involve a Delaware team." A168. Delaware's proposed sports betting scheme includes single-game betting in addition to multi-game (parlay) betting, as the Regulations define the term "maximum wager limit" to include "the maximum amount that can be wagered on a *single sports lottery wager be it head-to-head or parlay* . . . ." A168 (Regulations § 2.0, definition of "maximum wager limit") (emphasis added).

Delaware intends to commence its sports betting scheme on September 1, 2009, in time for the start of the upcoming NFL regular season. Though the NFL is its focus, Delaware intends to conduct—and the Regulations sanction—betting on all major professional and college sports.

## II.

On July 24, the Leagues filed a complaint against Governor Markell and Wayne Lemons, the Director of the Delaware State Lottery Office (collectively, Delaware or State), claiming that elements of Delaware's proposed sports betting scheme violate the Professional and Amateur Sports Protection Act (PASPA), 28 U.S.C. § 3701, *et seq.*[2] Although PASPA

---

**2.** The PASPA claim was brought at Count I. The Leagues also brought a claim under state law at Count II, which alleged that the sports betting scheme violates Section 17 of the Delaware Constitution because it does not con-

has broadly prohibited state-sponsored sports gambling since it took effect on January 1, 1993, the statute also "grandfathered" gambling schemes in individual states "to the extent that the scheme was conducted by that State" between 1976 and 1990.

Four days after filing their complaint, the Leagues filed a motion for preliminary injunction, requesting that the District Court enjoin the State "from commencing, instituting, operating and maintaining a proposed 'sports lottery' to the extent that such lottery permits (i) single-game sports betting, (ii) betting on sports other than professional football, or (iii) any other sports betting scheme that was not conducted by the State of Delaware in 1976" pending final adjudication of the Leagues' action.

The District Court held a scheduling conference on July 29 at which it urged the parties to reach an agreement by which the State would "stand down" pending an expedited adjudication of the merits. A268. The parties could not reach such an agreement, however, so the District Court asked for written submissions and held a conference on August 5. Following the conference, the court orally denied the Leagues' motion and scheduled a trial for December 7. On August 10, the District Court issued a 13–paragraph memorandum order explaining its reasons for denying the injunction.

In its memorandum order, the District Court found that the Leagues had not shown a likelihood of success on the merits. *Office of Comm'r of Baseball v. Markell*, 2009 WL 2450284, at *1 (D.Del. Aug. 10, 2009). Noting that "both sides vigorously and ably contend that they are entitled to win on the merits," the District Court stated: "On the current record, the court is simply not in a position to give either side a nod on the merits. Indeed, there may exist factual disputes as to what, if anything, the State of Delaware actually did in the past with respect to sports gambling; or as to what, if any, proposed sports betting activities are exempted by the federal statute at issue." *Id.* at *2. The District Court also noted that the Leagues suggested in their letter brief that the court treat their motion for preliminary injunction as a motion for summary judgment and questioned whether the Leagues had demonstrated both the requisite irreparable harm and that the balance of the equities fell in their favor. *See id.* at *2–4.

On August 7—prior to receipt of the District Court's memorandum opinion—the Leagues filed their notice of appeal. Three days later, the Leagues filed a motion to expedite their appeal and their opening brief. On August 12, Delaware filed a motion to dismiss the appeal and its opposition to the Leagues' motion to expedite. On August 13, we granted the Leagues' motion to expedite, issued a briefing schedule, and set oral argument for August 24.

It is often noted that the wheels of justice move slowly—and for good reason. As the procedural history of this case demonstrates, however, that is not always the case. When a party seeks injunctive relief, the stakes are high, time is of the essence, and a straightforward legal question is properly presented to us, prudence dictates that we answer that question with dispatch.

## III.

We begin, as always, by considering whether we have jurisdiction to hear this appeal. The Leagues claim we have juris-

---

stitute a permissible "lottery." The state-law claim is not at issue in this appeal.

diction under 28 U.S.C. § 1292(a), which provides: "courts of appeals shall have jurisdiction of appeals from: (1) Interlocutory orders of the district courts ... granting, continuing, modifying, *refusing*, or dissolving injunctions." (emphasis added). The State disagrees, arguing that we must apply the test set forth in *Carson v. American Brands, Inc.*, 450 U.S. 79, 101 S.Ct. 993, 67 L.Ed.2d 59 (1981), which requires the Leagues to show that the District Court's denial of the motion for preliminary injunction (1) will have a serious, perhaps irreparable, consequence; and (2) can be effectively challenged only by immediate appeal. *Id.* at 83, 101 S.Ct. 993; *see also Stringfellow v. Concerned Neighbors In Action*, 480 U.S. 370, 379, 107 S.Ct. 1177, 94 L.Ed.2d 389 (1987).

■ In arguing that the Leagues must establish the *Carson* factors, Delaware relies on dicta from some of our prior cases stating that both orders expressly denying injunctions and orders having the practical effect of denying injunctions must meet the two-prong *Carson* test. *See Vuitton v. White*, 945 F.2d 569, 574 (3d Cir.1991); *Ross v. Zavarella*, 916 F.2d 898, 902 (3d Cir.1990). But none of the cases upon which Delaware relies involved *express denials* of injunctive relief; rather, they dealt with orders that were alleged to have the *practical effect* of denying injunctive relief. Accordingly, the Leagues need not demonstrate that the order will have a "serious, perhaps irreparable, consequence" and can be "effectively challenged" only by immediate appeal. *See Cohen v. Bd. of Trs. of Univ. of Med.*, 867 F.2d 1455, 1464 (3d Cir.1989). The language of § 1292(a)(1) is clear and the Leagues need not satisfy any jurisdictional

hurdle beyond the fact that they have appealed from an order refusing to enter an injunction.

We next turn to the scope of our review under 28 U.S.C. § 1292(a). We have adopted a broad view of appellate jurisdiction under this section. *See Kershner v. Mazurkiewicz*, 670 F.2d 440, 445 (3d Cir. 1982); *see also* 16 CHARLES ALAN WRIGHT, ARTHUR R. MILLER & EDWARD H. COOPER, FEDERAL PRACTICE AND PROCEDURE § 3921.1, at 28 (2d ed. 1996) ("Jurisdiction of the interlocutory appeal [under § 1292(a)(1)] is in large measure jurisdiction to deal with all aspects of the case that have been sufficiently illuminated to enable decision by the court of appeals without further trial court development."). Moreover, we have held that "[w]hen an appeal is taken from an order made appealable by statute, we have all the powers with respect to that order listed in 28 U.S.C. § 2106." [3] *United Parcel Serv., Inc. v. U.S. Postal Serv.*, 615 F.2d 102, 107 (3d Cir.1980). Accordingly, we have broad authority to decide this case as appropriate under § 2106.

Having determined that we have authority to address all aspects of this case, we must determine whether it is proper to exercise that authority. "As a general rule, when an appeal is taken from the grant or denial of a preliminary injunction, the reviewing court will go no further into the merits than is necessary to decide the interlocutory appeal." *Callaway v. Block*, 763 F.2d 1283, 1287 n. 6 (11th Cir.1985). This ordinarily requires that we review the decision to grant or deny a preliminary injunction for abuse of discretion, employing the standard four-factor test. *See Al-*

---

**3.** Section 2106 provides: "The Supreme Court or any other court of appellate jurisdiction may affirm, modify, vacate, set aside or reverse any judgment, decree, or order of a court lawfully brought before it for review, and may remand the cause and direct the entry of such appropriate judgment, decree, or order, or require such further proceedings to be had as may be just under the circumstances."

*legheny Energy, Inc. v. DQE, Inc.,* 171 F.3d 153, 158 (3d Cir.1999). Nevertheless, the Supreme Court has held the "general rule" of limited review is one of "orderly judicial administration, not a limit on judicial power." *Thornburgh v. Am. Coll. of Obstetricians & Gynecologists,* 476 U.S. 747, 757, 106 S.Ct. 2169, 90 L.Ed.2d 779 (1986), *overruled on other grounds by Planned Parenthood of Se. Penn. v. Casey,* 505 U.S. 833, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992).

■ In *Thornburgh,* the Supreme Court considered whether this Court properly exercised its jurisdiction in striking down portions of a Pennsylvania statute following an appeal from the district court's partial denial of a preliminary injunction. *See id.* at 755–57, 106 S.Ct. 2169. The Supreme Court acknowledged that review of a preliminary injunction is normally limited to the injunction itself, but explained: "if a district court's ruling rests solely on a premise as to the applicable rule of law, and the facts are established or of no controlling relevance, that ruling may be reviewed even though the appeal is from the entry of a preliminary injunction." *Id.* At the same time, the Supreme Court cautioned: "A different situation is presented ... when there is no disagreement as to the law, but the probability of success on the merits depends on facts that are likely to emerge at trial." *Id.* at 757 n. 8, 106 S.Ct. 2169. In affirming this Court's decision to address the merits of the plaintiff's case, the Supreme Court quoted from our opinion:

> Thus, although this appeal arises from a ruling on a request for a preliminary injunction, we have before us an unusually complete factual and legal presentation from which to address the important constitutional issues at stake. The customary discretion accorded to a district court's ruling on a preliminary in-

junction yields to our plenary scope of review as to the applicable law.

*Id.* at 757, 106 S.Ct. 2169 (quoting *Am. Coll. of Obstetricians & Gynecologists v. Thornburgh,* 737 F.2d 283, 290 (3d Cir. 1984)).

The approach taken in *Thornburgh* has been embraced by a number of our sister courts of appeals. In an appeal from the grant of a preliminary injunction in *Campaign for Family Farms v. Glickman,* 200 F.3d 1180 (8th Cir.2000), the Court of Appeals for the Eighth Circuit exercised its discretion to reach the merits of the underlying dispute, determining that it was "faced with a purely legal issue on a fixed ... record." *Id.* at 1186–87. The court explained: "[t]he considerations that caution against a broad scope of review in the usual interlocutory appeal—that is, a tentative and provisional record with conflicting material facts—simply are not present here." *Id.* at 1187. Likewise, in *Solantic, LLC v. City of Neptune Beach,* 410 F.3d 1250 (11th Cir.2005), the Court of Appeals for the Eleventh Circuit assessed the merits of the plaintiff's First Amendment claim on appeal after the district court denied his request for a preliminary injunction. Finding that the facts of the case were "simple and straightforward, and the record need[ed] no explanation," *id.* at 1274, the court explained that "we do not think it necessary or prudent to confine our opinion to holding that [the plaintiff] has shown a *likelihood* of success on the merits, when it is altogether clear that [the plaintiff] *will* succeed on the merits of its First Amendment claims," *id.* at 1272 (emphasis in original). Finally, in *Doe v. Sundquist,* 106 F.3d 702 (6th Cir.1997), the Court of Appeals for the Sixth Circuit considered the merits of the plaintiffs' claim following a denial of their preliminary injunction motion. The court noted that "[i]f an issue unaddressed by the dis-

trict court is presented with sufficient clarity and completeness and its resolution will materially advance the progress of the litigation," consideration of that issue is proper. *Id.* at 707 (internal quotation marks and citation omitted). The court explained that "[t]he sort of judicial restraint that is normally warranted on interlocutory appeals does not prevent us from reaching clearly defined issues in the interest of judicial economy." *Id.* (citation omitted).

In light of *Thornburgh* and its progeny, we must determine whether the record in this appeal presents "a pure question of law" that is "intimately related to the merits of the grant [or denial] of preliminary injunctive relief," *United Parcel Serv.*, 615 F.2d at 107, or whether the Leagues' "probability of success on the merits depends on facts that are likely to emerge at trial," *Thornburgh*, 476 U.S. at 757 n. 8, 106 S.Ct. 2169. For the reasons that follow, we conclude that this case falls into the former category.

In denying the Leagues' motion for preliminary injunction, the District Court hypothesized that "there *may* exist factual disputes as to what, if anything, the State of Delaware actually did in the past with respect to sports gambling or as to what, if any, proposed sports betting activities are exempted by the federal statute at issue." *Markell*, 2009 WL 2450284, at *2 (emphasis added). Contrary to the District Court's supposition, we have reviewed the record and cannot find any material issues of fact in dispute. As the Leagues rightly argue, Judge Stapleton's opinion in *NFL* is the definitive word regarding the scope and extent of Delaware's gambling scheme as it was conducted in 1976; the State neither challenged Judge Stapleton's findings 33 years ago nor does so now. Likewise, the parties do not dispute the scope

and extent of the sports gambling scheme that Delaware intends to implement on September 1. As counsel for Delaware properly and candidly conceded at oral argument, the State intends to conduct widespread betting on both professional and college sports beyond the scope of the football-only parlays permitted in 1976. In sum, the parties agree upon what Delaware did in 1976 and what Delaware intends to do now. Given the absence of any disputed issue of material fact—as confirmed by both parties at oral argument— we conclude that this case does not turn on a "legal issue that might be seen in any different light after final hearing," *United Parcel Serv.*, 615 F.2d at 107, and is ripe for adjudication as a matter of law. Therefore, we will proceed to assess the merits of the Leagues' claim that Delaware's sports betting scheme violates PASPA.[4]

## IV.

We begin our legal analysis with the statutory language. PASPA prohibits any person or governmental entity from sponsoring, operating, advertising or promoting:

> a lottery, sweepstakes, or other betting, gambling, or wagering scheme based, directly or indirectly (through the use of geographical references or otherwise), on one or more competitive games in which amateur or professional athletes participate, or are intended to participate, or on one or more performances of such athletes in such games.

28 U.S.C. § 3702. The statute contains four exceptions, only one of which is relevant here. That exception provides that PASPA's general prohibition against sports betting shall not apply to: "lottery,

---

4. Because we reach the merits of this case, we need not consider the parties' arguments

regarding irreparable harm and the balancing of the equities.

sweepstakes, or other betting, gambling, or wagering scheme in operation in a State or other governmental entity, ***to the extent that the scheme was conducted by that State*** or other governmental entity at any time during the period beginning January 1, 1976, and ending August 31, 1990." 28 U.S.C. § 3704(a) (emphasis added).

Not surprisingly, the parties view PASPA's language differently, with both sides claiming that the plain language requires a favorable result on the merits.

### A.

Delaware contends that its sports betting scheme qualifies for the exception in § 3704(a)(1), claiming: "[t]he plain language of the pertinent PASPA exemption allows Delaware to reintroduce a sports lottery under State control because Delaware conducted such a scheme at some time between January 1, 1976, and August 31, 1990." Del. Br. at 3. The State also contends that the exemption "is broad in scope, and nowhere states that it restricts Delaware to operating particular lottery games for a particular sport." *Id.* at 32. In Delaware's view, § 3704(a)(1) allows it to conduct any "sports lottery under State control," *id.*, because it did so in 1976. Although the State acknowledges, as it must, that the exception permits its lottery only "to the extent that the scheme was conducted," it argues that the word "scheme" refers neither to the three particular games it offered in 1976, nor to parlay betting in general, nor even to wagering on NFL games, but to a "sports lottery under State control in which the winners of lottery games were affiliated with the outcome of sporting events." *Id.* at 33.

Even assuming that Delaware's interpretation of the word "scheme" were persuasive, we must reconcile that interpretation with the statutory language "*to the*

*extent* that the scheme *was conducted* by that State." (emphasis added). The State claims that this phrase merely "identifies a condition (*i.e.*, that a State must have conducted a sports lottery in the past in order to be permitted to operate a sports lottery in the future)," *id.* at 34, rather than limiting the State's gaming authority to either the particular sports or types of games previously offered. Delaware argues that because state law previously *authorized* a broad lottery encompassing many types of games and many sports, it may now *institute* a broad lottery with those features.

In contrast to Delaware's argument, the Leagues contend that the exception in § 3704(a)(1) applies only to lotteries or other schemes "to the extent" that such lottery or scheme "was conducted" by the State between January 1, 1976 and August 31, 1990. The Leagues insist that it is not sufficient that a particular lottery may have been contemplated, or even authorized, but rather we must consider the specific means by which the lottery was *actually conducted.*

We agree with the Leagues' interpretation. As the exception found at § 3704(a)(2) makes clear, there is a distinction between wagering schemes that were merely "authorized" and those that were "conducted." *See* 28 U.S.C. § 3704(a)(2) (which applies to a wagering scheme that was both (i) "authorized by a statute as in effect on October 2, 1991," and (ii) "actually was conducted during the period beginning September 1, 1989 and ending on October 2, 1991"). Whatever the breadth of the lottery authorized by Delaware state law in 1976, PASPA requires us to determine "the extent"—or degree—to which such lottery *was conducted.* We cannot hold—as the State impliedly suggests—that Congress meant to conflate "authorized" and "conducted." *See BFP v. Resolution Trust Corp.*, 511 U.S. 531, 537, 114

S.Ct. 1757, 128 L.Ed.2d 556 (1994) ("It is generally presumed that Congress acts intentionally and purposefully when it includes particular language in one section of a statute but omits it in another."); *Alaka v. Attorney General,* 456 F.3d 88, 97–98 (3d Cir.2006) ("It is a fundamental canon of statutory construction that where sections of a statute do not include a specific term used elsewhere in the statute, the drafters did not wish such a requirement to apply."). Thus, the sole exception upon which Delaware relies—applicable to wagering schemes dating back to 1976—applies only to schemes that were "conducted." 28 U.S.C. § 3704(a)(1).

While minimizing the importance of the language of § 3704(a)(2), Delaware asks us to draw parallels to § 3704(a)(3), which provides:

a betting, gambling, or wagering scheme, other than a lottery described in paragraph (1), conducted exclusively in casinos located in a municipality, but only *to the extent* that—(A) such scheme or a similar scheme was authorized, not later than one year after the effective date of this chapter, to be operated in that municipality; and (B) any commercial casino gaming scheme was in operation in such municipality throughout the 10–year period ending on such effective date pursuant to a comprehensive State regulation authorized by that State's constitution and applicable solely to such municipality[.]

(emphasis added). Delaware argues that the phrase "to the extent" must mean the same thing in § 3704(a)(1) as it does in § 3704(a)(3), where the phrase identifies a condition. We reject this argument out of hand because the exception contained in § 3704(a)(3)—which deals with casinos—differs in subject matter, structure, and syntax from the language of § 3704(a)(1).

As a fallback position, Delaware argues that PASPA is ambiguous such that resort to legislative history is necessary. We disagree, because as we have noted:

A statutory provision is not ambiguous simply because by itself, [it is] susceptible to differing constructions because in addition to the statutory language ... itself, we take account of the specific context in which that language is used, and the broader context of the statute as a whole. We assume, for example, that every word in a statute has meaning and avoid interpreting one part of a statute in a manner that renders another part superfluous.

*Disabled in Action v. SEPTA,* 539 F.3d 199, 210 (3d Cir.2008) (internal quotations and citations omitted). Applying these principles of statutory construction, we find unambiguous the phrase "to the extent that the scheme was conducted by that State," so our "inquiry comes to an end." *Kaufman v. Allstate N.J. Ins. Co.,* 561 F.3d 144, 155 (3d Cir.2009) (citation omitted).[5]

---

5. Delaware spends several pages of its brief explaining the legislative history and citing statements from various legislators. These statements are inconclusive at best. When we view them in their entirety rather than focusing on "cherry-picked" snippets, they offer no consistent insight into Congressional intent. For example, the Senate Report upon which Delaware relies, Del. Br. at 13, states that the exemption in § 3704(1) "is not intended to prevent ... Delaware from expanding their sports betting schemes into other

sports as long as it was authorized by State law.... At the same time, paragraph (1) does not intend to allow the expansion of sports lotteries into head-to-head betting...." A152 (Senate Report). This excerpt from the Senate Report is unhelpful in two respects. First, it is at odds with PASPA's statutory language. Second, it contradicts Delaware's claim that single-game wagering is permitted. Similarly unhelpful are the many statements of individual legislators cited by Delaware because such "cherry-picked" statements cannot be

Because we do not find PASPA ambiguous, we find unpersuasive Delaware's argument that its sovereign status requires that it be permitted to implement its proposed betting scheme. *See Gregory v. Ashcroft,* 501 U.S. 452, 460–61, 111 S.Ct. 2395, 115 L.Ed.2d 410 (1991) ("[A]bsent an unmistakably clear expression to alter the usual constitutional balance between the States and the Federal Government, [federal courts] will interpret a statute to preserve rather than destroy the States' substantial sovereign powers.") (internal quotations omitted). PASPA unmistakably prohibits state-sponsored gambling, 28 U.S.C. § 3702, subject to certain exceptions, 28 U.S.C. § 3704. Through PASPA, Congress has "altered the usual constitutional balance" with respect to sports wagering, although Delaware retains the right to implement a sports wagering scheme "to the extent that the scheme was conducted" previously. Those words of limitation are not rendered nugatory by generalized notions of "state sovereignty."

Finally, Delaware argues that we cannot construe the language "to the extent that the scheme was conducted" so narrowly because doing so would render the PASPA exception a nullity. Certain aspects of Scoreboard were deemed impermissible by either Judge Stapleton, *NFL,* 435 F.Supp. at 1387–88 (holding that Touchdown II violated the lottery provision of the Delaware Constitution by utilizing a fixed-payoff scheme), or the Delaware Supreme Court, *Op. of the Justices,* 385 A.2d 695, 705 (Del.1978) (striking down Football Bonus and Touchdown because they awarded prizes on a pari-mutuel basis in violation of the State's Constitution). Consequently, the State reasons that if it is confined to the exact scheme conducted in 1976, the exception would be illusory as applied to Delaware. The State argues that Congress could not have intended this result, especially when the legislative history makes clear that Delaware was one of only four states that were intended beneficiaries of the exception. *See Conn. Nat'l Bank v. Germain,* 503 U.S. 249, 253, 112 S.Ct. 1146, 117 L.Ed.2d 391 (1992) (courts should disfavor interpretations of statutes that render language superfluous).

Delaware's reading overstates the narrowness of the exception provided by § 3704(a)(1). We do not hold that PASPA requires Delaware's sports lottery to be identical in every respect to what the State conducted in 1976. Certain aspects of the lottery may differ from the lottery as conducted in 1976, as long as they do not effectuate a substantive change from the scheme that was conducted during the exception period. For example, as the State aptly noted—and the Leagues conceded—at oral argument, "to the extent the scheme was conducted" cannot mean that Delaware could institute a sports betting scheme for only four months as was done in 1976. Likewise, Delaware is neither limited to selling tickets at identical venues nor prohibited from allowing wagering on NFL teams that did not exist in 1976.

deemed to reflect the views of other legislators, much less of a majority of those who enacted the statute. *Szehinskyj v. Attorney General,* 432 F.3d 253, 256, (3d Cir.2005) ("[Appellant's] selective invocation of fragments of the floor debate is an object lesson in the perils of appealing to this particular kind of legislative history as a guide to statutory meaning. This case is a perfect illustration of the well-known admonition that what individual legislators say a statute will do, and what the language of the statute provides, may be far apart indeed. The law is what Congress enacts, not what its members say on the floor."). In sum, we conclude that "[t]he legislative history is more conflicting than the text is ambiguous," *Wong Yang Sung v. McGrath,* 339 U.S. 33, 49, 70 S.Ct. 445, 94 L.Ed. 616 (1950), and does not support the State's position.

Such *de minimis* alterations neither violate PASPA's language nor do violence to its central purposes, *viz.*, to limit the spread of state-sponsored sports gambling and maintain the integrity of sports. By contrast, expanding the very manner in which Delaware conducts gambling activities to new sports or to new forms of gambling—namely single-game betting—beyond "the extent" of what Delaware "conducted" in 1976 would engender the very ills that PASPA sought to combat. In construing statutes, we consider the statute's overall object and policy, and avoid constructions that produce "odd" or "absurd" results or that are "inconsistent with common sense." *Disabled in Action,* 539 F.3d at 210 (internal citations omitted).

### B.

■ In light of our reading of PASPA, we determine what scheme Delaware may conduct in 2009 with reference to the scheme it conducted in 1976. As Judge Stapleton held in *NFL*—and as was not disputed in the proceedings before either the District Court or our Court in this matter—the only sports betting scheme "conducted" by Delaware in 1976 involved the three Scoreboard games. That betting scheme was limited to multi-game parlays involving only NFL teams. Thus, any effort by Delaware to allow wagering on athletic contests involving sports beyond the NFL would violate PASPA. It is also undisputed that no single-game betting was "conducted" by Delaware in 1976, or at any other time during the time period that triggers the PASPA exception. *See NFL,* 435 F.Supp. at 1385 ("None of the [1976] games permits head-to-head or single game betting."). Because single-game betting was not "conducted" by Delaware between 1976 and 1990, such betting is beyond the scope of the exception in § 3704(a)(1) of PASPA and thus prohibited under the statute's plain language.

Under federal law, Delaware may, however, institute multi-game (parlay) betting on at least three NFL games, because such betting is consistent with the scheme to the extent it was conducted in 1976. Of course, we express no opinion regarding the legality of such a scheme under Delaware statutory or constitutional law.

For the foregoing reasons, we will vacate the order of the District Court and remand for proceedings consistent with this opinion.