VANASKIE, Circuit Judge,
concurring in part and dissenting in part.
I agree with my colleagues that the Leagues have standing to challenge New Jersey’s Sports Wagering Law, N.J. Stat. Ann. § 5:12A-2, and that the Professional and Amateur Sports Protection Act (“PAS-PA”), 28 U.S.C. :§ 3702, does not violate the principle of “equal sovereignty.” I therefore join parts III and IV.C of the majority’s decision in full. I also agree that, ordinarily, Congress has the authority to regulate gambling pursuant to the Commerce Clause, and thus I join part IV.A of the majority opinion as well. Yet, PASPA is no ordinary federal statute that directly regulates interstate commerce or activities substantially affecting such commerce. Instead, PASPA prohibits states from authorizing sports gambling and thereby directs how states must treat such activity. Indeed, according to my colleagues, PASPA essentially gives the states the choice of allowing totally unregulated betting on sporting events or prohibiting all such gambling. Because this congressional directive violates the principles of federalism as articulated by the Supreme Court in New York v. United States, 505 U.S. 144, 112 S.Ct. 2408, 120 L.Ed.2d 120 (1992), and Printz v. United States, 521 U.S. 898, 117 S.Ct. 2365, 138 L.Ed.2d 914 (1997), I respectfully dissent from that part of the majority’s opinion that upholds PASPA as a constitutional exercise of congressional authority.
I.
I agree with my colleagues that an appropriate starting point for addressing Appellants’ claims is Hodel v. Virginia Surface Mining & Reclamation Ass’n, 452 U.S. 264, 101 S.Ct. 2352, 69 L.Ed.2d 1 (1981). In Hodel, the Court reviewed the constitutionality of the federal Surface Mining Control and Reclamation Act, a comprehensive statutory scheme designed to regulate against the harmful effects of surface coal mining. Id. at 268, 101 S.Ct. 2352. The act permitted states that wished to exercise permanent regulatory authority over surface coal mining to submit plans that met federal standards for federal approval. Id. at 271, 101 S.Ct. 2352. In addition, the federal government created a federal enforcement program for states that did not obtain federal approval for state plans. Id. at 272, 101 S.Ct. 2352. Applying the framework set forth in the since-overruled case, National League of Cities v. Usery, 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976), overruled by Garcia v. San Antonio Metro. Transit Auth., 469 U.S. 528, 105 S.Ct. 1005, 83 L.Ed.2d 1016 (1985), the Court concluded that the act did not regulate “ ‘States as States’ ” because the challenged provisions governed only private individuals’ and business’ activities and because “the States are not compelled to enforce the ... standards, to expend any state funds, or to participate in the federal regulatory program in any manner whatsoever.” Id. at 287-88, 101 S.Ct. 2352. The Court further explained that
[i]f a State does not wish to submit a proposed permanent program that complies with the Act and implementing regulations, the full regulatory burden will be borne by the Federal Government. Thus, there can be no suggestion *242 that the Act commandeers the legislative processes of the States by directly compelling them to enact and enforce a federal regulatory program.
Id. at 288, 101 S.Ct. 2352. Even post-Garcia, the Court has explained that the act at issue in Hodel presented no Tenth Amendment problem “because it merely made compliance with federal standards a precondition to continued state regulation in an otherwise pre-empted field.” Printz, 521 U.S. at 926, 117 S.Ct. 2365.
As the majority points out, a year later, in FERC v. Mississippi, 456 U.S. 742, 102 S.Ct. 2126, 72 L.Ed.2d 532 (1982), the Court upheld the constitutionality of two titles of the Public Utility Regulatory Policies Act (“PURPA”), which directed state regulatory authorities to “consider” certain standards and approaches to regulate energy and prescribed certain procedures, but did not require the state authorities to adopt or implement specified standards. Id. at 745-50, 102 S.Ct. 2126. As in Hodel, the Court observed that Congress had authority to preempt the field at issue — in FERC’s case, energy regulation. Id. at 765, 102 S.Ct. 2126. The Court explained:
PURPA should not be invalid simply because, out of deference to state authority, Congress adopted a less intrusive scheme and allowed the States to continue regulating in the area on the condition that they consider the suggested federal standards. While the condition here is affirmative in nature — that is, it directs the States to entertain proposals — nothing in this Court’s cases suggests that the nature of the condition makes it a constitutionally improper one. There is nothing in PURPA “directly compelling” the States to enact a legislative program. In short, because the two challenged Titles simply condition continued state involvement in a pre-empti-ble area on the consideration of federal proposals, they do not threaten the States’ “separate and independent existence,” Lane County v. Oregon, [74 U.S. 71] 7 Wall. 71, 76, 19 L.Ed. 101 (1869); Coyle v. Oklahoma, 221 U.S. 559, 580, 31 S.Ct. 688, 695, 55 L.Ed. 853 (1911), and do not impair the ability of the States “to function effectively in a federal system.” Fry v. United States, 421 U.S. [542], at 547, n. 7, 95 S.Ct. [1792], at 1795, n. 7 [44 L.Ed.2d 363 (1975) ]; National League of Cities v. Usery, 426 U.S. [833], at 852, 96 S.Ct. [2465], at 2474 [49 L.Ed.2d 245 (1976) ]. To the contrary, they offer the States a vehicle for remaining active in an area of overriding concern.
Id. at 765-66,102 S.Ct. 2126.
Subsequently, the Supreme Court struck down provisions in two cases based on violations of federalism principles. At issue in the first case, New York, was a federal statute that intended to incentivize “States to provide for the disposal of low level radioactive waste generated within their borders.” New York, 505 U.S. at 170, 112 S.Ct. 2408. As “an alternative to regulating pursuant to Congress’ direction,” one of the “incentives” provided states the “option of taking title to and possession of the low level radioactive waste ... and becoming liable for all damages waste generators suffered] as a result of the State’s failure to do so promptly.” Id. at 174-75, 112 S.Ct. 2408. At the outset, the Court characterized the issue before it as “concerning] the circumstances under which Congress may use the State as implements of regulation; that is, whether Congress may direct or otherwise motivate the States to regulate in a particular field or a particular way.” Id at 161, 112 S.Ct. 2408.
The Court in New York held the “take title” provision unconstitutional because it “ ‘commandeer[ed] the legislative processes of the States by directly compelling them to enact and enforce a federal regulatory program’ ” in violation of the princi- *243 pies of federalism. Id. at 176, 112 S.Ct. 2408 (quoting Hodel, 452 U.S. at 288, 101 S.Ct. 2352). The Court explained that “even where Congress has the authority under the Constitution to pass laws requiring or prohibiting certain acts, it lacks the power directly to compel the States to require or prohibit those acts.” Id. at 166, 112 S.Ct. 2408 (emphasis added). It further elaborated that “[t]he allocation of power contained in the Commerce Clause, for example, authorizes Congress to regulate interstate commerce directly; it does not authorize Congress to regulate state governments’ regulation of interstate commerce.” Id. (emphasis added).
Second, in Pnntz, the Court reviewed a temporary federal statutory provision that required certain state law enforcement officers to conduct background checks on potential handgun purchasers as part of a federal regulatory scheme. Printz, 521 U.S. at 903-04, 117 S.Ct. 2365. Observing that “ ‘[t]he Federal Government may not compel the States to enact or administer a federal regulatory program,’ ” id. at 933, 117 S.Ct. 2365 (quoting New York, 505 U.S. at 188, 112 S.Ct. 2408), the Court held that “Congress cannot circumvent that prohibition by conscripting the State’s officers directly.” Id. at 935, 117 S.Ct. 2365. The Court further explained that Congress categorically “may neither issue directives requiring the States to address particular problems, nor command the States’ officers, or those of their political subdivisions, to administer or enforce a federal regulatory program.” Id.
Later, in Reno v. Condon, 528 U.S. 141, 120 S.Ct. 666, 145 L.Ed.2d 587 (2000), a case the majority regards as “remarkably similar” to the matter sub judice, (Maj. Op. at 223-24), a unanimous Court held that the Driver’s Privacy Protection Act (“DPPA”), a generally applicable law which regulates the disclosure and resale by states and private persons of personal information contained in state department of motor vehicle records, “did not run afoul of the federalism principles enunciated in New York ... and Printz.” Id. at 143, 146, 151, 120 S.Ct. 666. After first determining that the DPPA was a proper exercise of congressional authority under the Commerce Clause, the Court rejected South Carolina’s argument that the act violated federalism principles because it would “require time and effort on the part of state employees.” Id. at 148, 150, 120 S.Ct. 666. Finding New York and Printz inapplicable, the Court relied instead on South Carolina v. Baker, 485 U.S. 505, 108 S.Ct. 1355, 99 L.Ed.2d 592 (1988),[1] which “upheld a statute that prohibited States from issuing unregistered bonds because the law ‘regulate[d] state activities,’ rather than ‘seeking[ing] to control or influence the manner in which States regulate private parties.’ ” Reno, 528 U.S. at 150, 120 S.Ct. 666 (quoting Baker, 485 U.S. at 514-15, 108 S.Ct. 1355).[2] The Court further explained:
*244 The DPPA does not require the States in their sovereign capacity to regulate their own citizens. The DPPA regulates the States as the owners of data bases. It does not require the South Carolina Legislature to enact any laws or regulations, and it does not require state officials to assist in the enforcement of federal statutes regulating private individuals.
Id. at 151,108 S.Ct. 1355.
Most recently, in National Federation of Independent Business v. Sebelius, — U.S.-, 132 S.Ct. 2566, 183 L.Ed.2d 450 (2012), the Court struck down, as violative of the Spending Clause, a provision in the Patient Protection and Affordable Care Act (“ACA”) that would have withheld federal Medicaid grants to states unless they expanded their Medicaid eligibility requirements in accordance with conditions in the ACA. Id. at 2581-82, 2606-07 (plurality). Quoting New York, Chief Justice Roberts, writing for a three-justice plurality, observed that “‘the Constitution has never been understood to confer upon Congress the ability to require the States to govern according to Congress’ instructions.’ ” Id. at 2602 (quoting New York, 505 U.S. at 162, 112 S.Ct. 2408). The plurality then explained that, based on that principle, New York and PHntz had struck down federal statutes that “commandeer[ed] a State’s legislative or administrative apparatus for federal purposes.” Id. The plurality also noted that, within the authority of the Spending Clause, Congress may not create “inducements to exert a power akin to undue influence” where “pressure [would] turn[] into compulsion.” Id. (internal quotations omitted). Recognizing that “ ‘[t]he Constitution simply does not give Congress the authority to require the States to regulate,’ ” the plurality observed that “[t]hat is true whether Congress directly commands a State to regulate or indirectly coerces a State to adopt a federal regulatory system of its own.” Id. (quoting New York, 505 U.S. at 178, 112 S.Ct. 2408). The plurality ultimately concluded that the Medicaid conditions were unduly coercive and reiterated that “Congress may not simply ‘conscript state [agencies] into the national bureaucratic army.’ ” Id. at 2604, 2606-07 (quoting FERC, 456 U.S. at 775, 102 S.Ct. 2126 (O’Connor, J., concurring in judgment in part and dissenting in part)).
While Chief Justice Roberts’ opinion concerning the Medicaid expansion provisions in Sebelius garnered the signatures of only three justices, the four dissenting justices also invoked the federalism principles of New York in concluding that the funding conditions in the Medicaid expansion impermissibly compelled states to govern as directed by Congress by coercing states’ participation in the expanded program. Id. at 2660-62 (Scalia, Kennedy, Thomas, and Alito, JJ., dissenting). Thus, seven justices found the Medicaid expansion unconstitutional, citing the federalism principles articulated in New York as part of the basis for their conclusion. Importantly, the seven-justice rejection of the Medicaid expansion based, in part, on New York, represents a clear signal from the Court that the principles enunciated in New York are not limited to a narrow class of cases in which Congress specifically directs a state legislature to affirmatively enact legislation. Cf. United States v. Richardson, 658 F.3d 333, 340 (3d Cir. 2011) (observing that even if not binding due to the votes of a splintered Court, “the collective view of [a majority of] justices is, of course, persuasive authority”).
II.
New York and PHntz clearly established that the federal government cannot direct state legislatures to enact legislation and state officials to implement federal policy. It is true that the two particular statutes *245 under review in those cases involved congressional commands that states affirmatively enact legislation, see New York, 505 U.S. at 176-77, 112 S.Ct. 2408, or affirmatively enforce a federal regulatory scheme, see Printz, 521 U.S. at 935, 117 S.Ct. 2365. Nothing in New York or Printz, however, limited the principles of federalism upon which those cases relied to situations in which Congress directed affirmative activity on the part of the states. Rather, the general principle articulated by the Court in New York was that
even where Congress has the authority under the Constitution to pass laws requiring or prohibiting certain acts, it lacks the power directly to compel the States to require or prohibit those acts. The allocation of power contained in the Commerce Clause, for example, authorizes Congress to regulate interstate commerce directly; it does not authorize Congress to regulate state governments’ regulation of interstate commerce.
New York, 505 U.S. at 166, 112 S.Ct. 2408 (emphasis added) (citations omitted). Here, it cannot be disputed that PASPÁ “regulate[s] state governments’ regulation of interstate commerce.” See id. States regulate gambling, in part, by licensing or authorizing such activity. By prohibiting states from licensing or authorizing sports gambling, PASPA dictates the manner in which states must regulate interstate commerce and thus contravenes the principles of federalism set forth in New York and Printz.[3]
If the objective of the federal government is to require states to regulate in a manner that effectuates federal policy, any distinction between a federal directive that commands states to take affirmative action and one that prohibits states from exercising their sovereignty is illusory. Whether stated as a command to engage in specific action or as a prohibition against specific action, the federal government’s interference with a state’s sovereign autonomy is the same. Moreover, the recognition of such a distinction is untenable, as affirmative commands to engage in certain conduct can be rephrased as a prohibition against not engaging in that conduct. Surely the structure of Our Federalism does not turn on the phraseology used by Congress in commanding the states how to regulate. An interpretation of federalism principles that permits congressional negative commands to state governments will eviscerate the constitutional lines drawn in New York and Printz that recognized the limit to Congress’s power to compel state instrumentalities to carry out federal policy-
In addition, PASPA implicates the political accountability concerns voiced by the Supreme Court in New York and Printz. In New York, the Court observed that when the federal government preempts an area with a federal law to impose its view on an issue, it “makes the decision in full view of the public, and it will be federal officials that suffer the consequences if the decision turns out to be detrimental or unpopular.” New York, 505 U.S. at 168, *246 112 S.Ct. 2408. In contrast, the Court explained, “where the Federal Government directs the States to regulate, it may be state officials who will bear the brunt of public disapproval, while the federal officials who devised the regulatory program may remain insulated from the electoral ramifications of their decision.” Id. at 169, 112 S.Ct. 2408. The Court also recognized in Printz that in situations where Congress compels state officials to “implement ] a federal regulatory program, Members of Congress can take credit for ‘solving’ problems without having to ask their constituents to pay for the solutions with higher federal taxes” and that states “are ... put in the position of taking the blame for [the federal program’s] burden-someness and for its defects.” Printz, 521 U.S. at 930, 117 S.Ct. 2365. Although PASPA does not “direct[] the States to regulate,” New York, 505 U.S. at 169, 112 S.Ct. 2408, or “implement[ ] a federal regulatory program,” Printz, 521 U.S. at 930, 117 S.Ct. 2365, its prohibition on state authorization and licensing of sports gambling similarly diminishes the accountability of federal officials at the expense of state officials. Instead of directly regulating or banning sports gambling, Congress passed the responsibility to the states, which, under PASPA, may not authorize or issue state licenses for such activities. New Jersey law regulates games of chance, see N.J. Stat. Ann. § 5:8-1, et seq., state lotteries, see id. § 5:9-1, et seq., and casino gambling within the state, see id. § 5:12-1, et seq. As a result, it would be natural for New Jersey citizens to believe that state law governs sports gambling as well. That belief would be further supported by the fact that the voters of New Jersey recently passed a state constitutional amendment permitting sports gambling and their representatives in the state legislature subsequently enacted the Sports Wagering Law, at issue here, to regulate such activity. When New Jersey fails to authorize or license sports gambling, its citizens will understandably blame state officials even though state regulation of gambling has become a puppet of the federal government, whose strings are in reality pulled (or cut) by PASPA. States can authorize and regulate some forms of gambling, e.g., lotteries and casinos, but not other forms of gambling to implement policy choices made by Congress. Thus, accountability concerns arising from PASPA’s restraint on state regulation also counsel in favor of concluding that it violates principles of federalism.
I do not suggest that the federal government may not prohibit certain actions by state governments — indeed it can. If Congress identifies a problem that falls within its realm of authority, it may provide a federal solution directly itself or properly incentivize states to regulate or comply with federal standards. For example, if Congress chooses to regulate (or deregulate) directly, it may require states to refrain from enacting their own regulations that, in Congress’s judgment, would thwart its policy objectives. Illustrating this point, the Supreme Court held in Morales v. Trans World Airlines, Inc., 504 U.S. 374, 112 S.Ct. 2031, 119 L.Ed.2d 157 (1992), that the federal Airline Deregulation Act, which “prohibited the States from enforcing any law ‘relating to rates, routes, or services’ of any air carrier” preempted guidelines regarding fair advertising set forth by an organization of state attorneys general. Id. at 378-79, 391, 112 S.Ct. 2031. There, as the Court explained, the purpose of the federal prohibition against further state regulation was “[t]o ensure that the States would not undo federal deregulation with regulation of their own.” Id. at 378, 112 S.Ct. 2031. Thus, a state law contrary to a federal regulatory or deregulatory scheme is void under the Supremacy Clause.[4]
*247 Unlike in Morales and other preemption cases in which federal legislation limits the actions of state governments, in this case, there is no federal scheme regulating or deregulating sports gambling by which to preempt state regulation. PASPA provides no federal regulatory standards or requirements of its own. Instead, it simply prohibits states from “sponsoring], operating], advertising], promoting], licensing], or authorizing]” gambling on sports. 28 U.S.C. § 3702(1). And, PAS-PA certainly cannot be said to be a dereg-ulatory measure, as its purpose was to stem the spread of state-sponsored sports gambling, not let it go unregulated.[5] See S.Rep. No. 102-248, at 3 (1991) (“The purpose of S. 474 is to prohibit sports gambling conducted by, or authorized under the law of, any State or other governmental entity.”); id. at 4 (“Senate bill 474 serves an important public purpose, to stop the spread of State-sponsored sports gambling....”).
Moreover, contrary to the majority opinion’s suggestion, other federal statutes relating to sports gambling do not aggregate to form the foundation of a federal regulatory scheme that can be interpreted as preempting state regulation of sports gambling. First, Section 1084 of Title 18 of the United States Code makes it a federal crime to use wire communications to transmit sports bets in interstate commerce unless the transmission is from and to a state where sports betting is legal. See 18 U.S.C. § 1084(a)-(b). Thus, under that section, state law, rather than federal law, determines whether the specified conduct falls within the criminal statute.[6] Second, another federal law prohibits any “schejme ... to influence ... by bribery any sporting contest.” Id. § 224(a). But, that same section expressly indicates that it “shall not be construed as indicating an intent on the part of Congress to occupy the field in which this section operations to the exclusion of any State,” and further disavows any attempt to preempt otherwise valid state laws. Id. § 224(b). A third federal statute carves out an exception to the general federal prohibition against transporting or mailing material and broadcasting information relating to lotteries for those conducted or authorized by states. Id. § 1307(a)-(b). That exception, however, does not pertain to the- transportation or mailing of “equipment, tickets, or material” for sports lotteries. Id. § 1307(b), (d). Thus, while state sports lotteries violate § 1307, that section does not provide a basis for inferring that it, together with PASPA, provides a federal regulatory scheme that preempts state regulation of sports gambling by private parties.[7] Fur *248 ther indicating federal deference to state laws on the subject, a fourth federal statute makes it a crime to transport wagering paraphernalia in interstate commerce but does not apply to betting materials to be used on sporting events in states where such betting is legal. Id. § 1953(a)-(b). As a result, the federal prohibition of state-authorized sports gambling does not emanate from a federal regulatory scheme that expressly or implicitly preempts state regulation that would conflict with federal policy. Instead, PASPA attempts to implement federal policy by telling the states that they may not regulate an otherwise unregulated activity. The Constitution affords Congress no such power. See New York, 505 U.S. at 178, 112 S.Ct. 2408 (“The Constitution ... gives Congress the authority to regulate matters directly and to pre-empt contrary state regulation. Where a federal interest is sufficiently strong to cause Congress to legislate, it must do so directly....”).
In addition to preempting state regulation with federal regulation, in some circumstances, Congress may regulate states directly as part of a generally applicable law. See, e.g., New York, 505 U.S. at 160, 112 S.Ct. 2408 (collecting cases). That is what Congress did with the DPPA, which the Court expressly found in Reno to be generally applicable. See Reno, 528 U.S. at 151, 120 S.Ct. 666 (“[W]e need not address the question whether general applicability is a constitutional requirement for federal regulation of the States, because the DPPA is generally applicable. The DPPA regulates the universe of entities that participate as suppliers to the market for motor vehicle information.... ”). Yet, unlike the DPPA in Reno, but like the act in New York, PASPA is not an example of a generally applicable law that subjects states to the same federal regulation as private parties. See New York, 505 U.S. at 160, 112 S.Ct. 2408 (“This litigation presents no occasion to apply or revisit the holdings of ... cases [concerning generally applicable laws], as this is not a case in which Congress has subjected a State to the same legislation applicable to private parties.”). In addition to its restrictions on actions by state governments relating to sports gambling, PASPA also forbids “a person to sponsor, operate, advertise, or promote” sports gambling if done “pursuant to the law or compact of a governmental entity." 18 U.S.C. § 3702(2) (emphasis added); see also supra note 2. Thus, PAS-PA’s reach to private parties is predicated on a state’s authorization of sponsorship, operation, advertisement, or promotion of sports gambling pursuant to state law.[8] Accordingly, PASPA cannot be said to “subject[ ] ... States[s] to the same legislation applicable to private parties,” New York, 505 U.S. at 160, 112 S.Ct. 2408, for state law determines whether § 3702(2) reaches any particular individual.
Nor does Reno stand more generally for the proposition that a violation of “anti-commandeering” federalism principles occurs only when Congress requires affirmative activity by state governments. It is true that in upholding the DPPA, the Court noted that it “d[id] not require the South Carolina Legislature to enact any laws or regulations, and it d[id] not require state officials to assist in the enforcement of federal statutes regulating private individuals.” Reno, 528 U.S. at 151, 120 S.Ct. 666. Read in context, however, that statement does not suggest that the principles *249 of federalism articulated in New York and Printz are limited only to situations in which Congress compels states to enact laws or enforce federal regulation. The two sentences preceding that statement make that clear. First, the Court recognized that “the DPPA d[id] not require the States in their sovereign capacity to regulate their own citizens.” Id. But here, PASPA does “require states in their sovereign capacity to regulate their own citizens,” id., because it dictates how they must regulate sports gambling. Pursuant to PASPA, states may not “sponsor, operate, advertise, promote, license, or authorize” such activity, 28 U.S.C. § 3702(1). Thus, states must govern accordingly, even if that means by refraining from providing a regulatory scheme that governs sports gambling.
Second, the Court explained in Reno that, “[t]he DPPA regulates the States as owners of data bases” of personal information in motor vehicle records. Reno, 528 U.S. at 151, 120 S.Ct. 666 (emphasis added). The fact that the DPPA regulated states as “suppliers to the market for motor vehicle information,” id, clearly indicates that the Court viewed the DPPA as direct congressional regulation of interstate commerce, id. at 148, 120 S.Ct. 666 (recognizing that motor vehicle information, in the context of the DPPA, is “an article of commerce”), rather than a federal requirement for the states to regulate such activity, see New York, 505 U.S. at 166, 112 S.Ct. 2408 (“The allocation of power contained in the Commerce Clause ... authorizes Congress to regulate interstate commerce directly; it does not authorize Congress to regulate state governments’ regulation of interstate commerce.”). Although the Court declined to find that New York and Printz governed the DPPA merely because it would “require time and effort on the part of state employees,” it clarified that federally mandated action by states to comply with federal regulations is not necessarily fatal to a federal law that “‘regulate[s] state activities,’ rather than ‘seeking]'to control or influence the manner in which States regulate private parties.’” Reno, 528 U.S. at 150, 120 S.Ct. 666 (quoting Baker, 485 U.S. at 514-15, 108 S.Ct. 1355) (second alteration in original).
The direct federal regulation of interstate commerce under the DPPA obviously distinguishes Reno from New York and Printz, where the federal statutes at issue in those cases required states to enact legislation and enforce federal policy, respectively. But it also distinguishes Reno from this case. As the Court recognized, “[t]he DPPA established] a regulatory scheme.” Reno, 528 U.S. at 144, 148, 151, 120 S.Ct. 666. As discussed above, however, PASPA is not itself a regulatory scheme, nor does it combine with several other scattered statutes in the criminal code to create a federal regulatory scheme. And while Congress could have regulated sports gambling directly under the Commerce Clause, just as it regulated motor vehicle information under the DPPA, it did not. Instead, it chose to set federal parameters as to how states may regulate sports gambling. As a result, any reliance on Reno to uphold PASPA is misplaced.
Hodel and FERC also provide no support for upholding PASPA. In Hodel, the statute at issue permitted states to submit a state regulatory plan for federal approval if they wished to regulate surface coal mining; if states did not seek or obtain approval, then a federal enforcement program would take effect. Hodel, 452 U.S. at 271-72, 101 S.Ct. 2352. The Court determined that the federal statute did not “commandeer!] the legislative process of the States” because states had a choice about whether to implement regulation that conformed to federal standards or let *250 the federal government bear the burden of regulation. • Id. at 288, 101 S.Ct. 2352; see also Printz, 521 U.S. at 925-26, 117 S.Ct. 2365 (“In Hodel ... we concluded that the Surface Mining Control and Reclamation Act of 1977 did not present [a Tenth Amendment] problem ... because it merely made compliance with federal standards a precondition to continued state regulation in an otherwise pre-empted field.” (citation omitted)). If PASPA provided a similar choice to states — to either implement state regulation of sports gambling that met federal standards or allow federal regulation to take effect — then perhaps it would pass constitutional muster. But it does not. Therefore Hodel is inapplicable to the case at hand.
In addition, in upholding Titles I and III of PURPA in FERC, the Court focused on the fact that those titles merely required that states “consider the suggested federal standards” as a condition to continued state regulation. FERC, 456 U.S. at 765, 102 S.Ct. 2126; see also id. at 765-66, 102 S.Ct. 2126 (“In short, because the two challenged Titles simply condition continued state involvement in a pre-emptible area on the consideration of federal proposals, they do not threaten the States’ separate and independent existence, and do not impair the ability of the States to function effectively in a federal system.” (citations omitted) (internal quotation marks omitted)). Here, PASPA does not provide suggested federal standards and approaches that states must consider in their regulation of sports gambling. Rather, PASPA strips any regulatory choice from state governments.[9] Furthermore, while the PURPA titles in FERC did “not involve the compelled exercise of Mississippi’s sovereign powers,” id. at 769, 102 S.Ct. 2126, PASPA does indeed suffer from the obverse of such a constitutional defect: it prohibits the exercise of states’ sovereign powers. FERC is thus distinguishable and inapposite.
Finally, as recognized by the majority, our decision in Office of the Commissioner of Baseball v. Markell, 579 F.3d 293 (3d Cir.2009), does not bind us to reject a challenge to PASPA on federalism grounds. In that case, we determined that a statutory phrase concerning the extent to which states grandfathered under PAS-PA could operate certain types of sports gambling was unambiguous. Id. at 302-03. As a result of the unambiguous language in PASPA, “we f[ou]nd unpersuasive Delaware’s argument that its sovereign status requires that it be permitted to implement its proposed betting scheme.” Id. at 303. That finding, however, related to our conclusion that PASPA gave clear notice of its “'alteration [of] the usual constitutional balance’ with respect to sports wagering,” and thus satisfied the requirement of Gregory v. Ashcroft, 501 U.S. 452, 111 S.Ct. 2395, 115 L.Ed.2d 410 (1991). See Markell, 579 F.3d at 303. Yet, here, we are not dealing with a question of which sovereign — state or federal — has the authority under either the “usual” or “altered” constitutional balance to regulate sports gambling. Congress does have the authority to regulate sports gambling when it does so itself. In this case, however, we are faced with the issue of whether Congress has the authority to regulate how states regulate sports gambling. *251 Thus, our rejection of Delaware’s “sovereign status” argument has no bearing on the issue before us. Furthermore, Mar-kell provides no guidance in this case, because there we addressed only the meaning of the statutory exception to PASPA relating to grandfathered states found at 28 U.S.C. § 3704(a)(1). Markell, 579 F.3d. at 300-01. We did not pass upon the issue of whether Congress may constitutionally restrict how states can regulate under § 3702(1).
In sum, no case law supports permitting Congress to achieve federal policy objectives by dictating how states regulate sports gambling. Instead of directly regulating state activities or interstate commerce, PASPA “seek[s] to control or influence the manner in which States regulate private parties,” a distinction the Supreme Court has recognized as significant. See Reno, 528 U.S. at 150, 120 S.Ct. 666 (internal quotation marks omitted) (“In Baker, we upheld a statute that prohibited States from issuing unregistered bonds because the law Tegulate[d] state activities,’ rather than ‘seekfing] to control or influence the manner in which States regulate private parties.’ ” (quoting Baker, 485 U.S. at 514-15, 108 S.Ct. 1355)); see also New York, 505 U.S at 166, 112 S.Ct. 2408 (“The allocation of power contained in the Commerce Clause ... authorizes Congress to regulate interstate commerce directly; it does not authorize Congress to regulate state governments’ regulation of interstate commerce.”).
Moreover, no legal principle exists for finding a distinction between the federal government compelling state governments to exercise them sovereignty to enact or enforce laws on the one hand, and restricting state governments from exercising their sovereignty to enact or enforce laws on the other. In both scenarios the federal government is regulating how states regulate. If Congress identifies a problem involving or affecting interstate commerce and wishes to provide a policy solution, it may regulate the commercial activity itself, see New York, 505 U.S. at 166, 112 S.Ct. 2408, and may even regulate state activity that involves interstate commerce, see Reno, 528 U.S. at 150-51, 120 S.Ct. 666; Baker, 485 U.S. at 514, 108 S.Ct. 1355. In addition, Congress may provide states a choice about whether to implement state regulations consistent with federal standards or let federal regulation preempt state law, see Hodel, 452 U.S. at 288, 101 S.Ct. 2352, and may require states to “consider” federal standards or approaches to regulation in deciding how to regulate in a pre-emptible area, see FERC, 456 U.S. at 765-66, 102 S.Ct. 2126. Furthermore, Congress may “encourage a State to regulate in a particular way,” New York, 505 U.S. at 166, 112 S.Ct. 2408, — even in areas outside the scope of Congress’s Article I, § 8 powers — by “attaching] conditions on the receipt of federal funds,” South Dakota v. Dole, 483 U.S. 203, 206-07, 107 S.Ct. 2793, 97 L.Ed.2d 171 (1987). But, what Congress may not do is “regulate state governments’ regulation.” See New York, 505 U.S. at 166, 112 S.Ct. 2408. Whether commanding the use of state machinery to regulate or commanding the nonuse of state machinery to regulate, the Supreme Court “has been explicit” that “the Constitution has never been understood to confer upon Congress the ability to require the States to govern according to Congress’ instructions.” Id. at 162, 112 S.Ct. 2408. Because that is exactly what PASPA does here, I conclude it violates the principles of federalism articulated in New York and Printz. Therefore, I would reverse the District Court’s order granting summary judgment for Plaintiffs and vacate the permanent injunction.

. The majority also characterizes Baker as "remarkably similar” to PASPA’s prohibition of state action. (Maj. Op. at 223-24.)

. In Baker, the Court observed:
The [intervenor] nonetheless contends that § 310 has commandeered the state legislative and administrative process because many state legislatures had to amend a substantial number of statutes in order to issue bonds in registered form and because state officials had to devote substantial effort to determine how best to implement a registered bond system. Such "commandeering” is, however, an inevitable consequence of regulating a state activity. Any federal regulation demands compliance. That a State wishing to engage in certain activity must take administrative and sometimes legislative action to comply with federal standards regulating that activity is a commonplace that presents no constitutional defect.
Baker, 485 U.S. at 514-15, 108 S.Ct. 1355.

. I agree with my colleagues that Congress has the authority under the Commerce Clause to ban gambling on sporting events, and that such a ban could include state-licensed gambling. I part company with my colleagues because that is not what PASPA does. Instead, PASPA conscripts the states as foot soldiers to implement a congressional policy choice that wagering on sporting events should be prohibited to the greatest extent practicable. Contrary to the majority’s view, the Supremacy Clause simply does not give Congress the power to .tell the states what they can and cannot do in the absence of a validly-enacted federal regulatory or deregu-latory scheme. As explained at pages 13-14, infra, there is no federal regulatory or deregu-latory scheme on the matter of sports wagering. Instead, there is the congressional directive that states not allow it.

. Significantly, the majority opinion does not cite any case that sustained a federal statute that purported to regulate the states under the Commerce Clause where there was no underlying federal scheme of regulation or deregulation. In this sense, PASPA stands alone in telling the states that they may not regulate an aspect of interstate commerce that Congress believes should be prohibited.

. The majority reasons that PASPA does not commandeer the states in battling sports gambling because the states retain the choice of repealing their laws outlawing such activity, observing that PASPA does not “require [] that the states keep any law in place.” (Maj. Op. at 232.) Contrary to the majority's supposition, it certainly is open to debate whether a state's repeal of a ban on sports gambling would be akin to that state's "authorizing” gambling on sporting events, action that PAS-PA explicitly forecloses.

. Accordingly, if a state repealed an existing ban on wagering on sporting events, federal law would not be implicated.

. PASPA only extends its prohibition to private persons to the extent persons "sponsor, operate, advertise, or promote [sports gambling] pursuant to the law or compact of a governmental entity.” 28 U.S.C. § 3702(2). Because the federal statute applies only to persons who act pursuant to state law, it cannot be said to directly .regulate persons.

. According to the majority, a state would presumably not run afoul of PASPA if it merely refused to prohibit sports gambling. The resulting unregulated market, however, portends grave consequences for which state officials would be held accountable, even though it would be federal policy that prohibits the states from taking effective measures to regulate and police this activity. In this sense, PASPA is indeed coercive.

. The majority asserts that the two "choices” presented to a state by PASPA — to "repeal its sports wagering ban [or] to keep a complete ban on sports wagering” — “leave much room for the states to make their own policy.” (Maj. Op. at 233.) Even if the majority's reading of PASPA as affording these choices is correct, I fail to discern the "room” that is accorded the states to make their own policy on sports wagering. It seems to me that the only choice is to allow for completely unregulated sports wagering (a result that Congress certainly did not intend to foster), or to ban sports wagering completely.